(No. 21303.—

W. M. ALLEN SON. & Co., Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(CYRUS KELLY, Defendant in Error.)

*Opinion filed June 24, 1932.*

E. V. Champion, for plaintiff in error.

John E. Cassidy, for defendant in error.

Mr. Justice Dunn delivered the opinion of the court:

Cyrus Kelly had been employed for two or three months prior to February 19, 1930, by W. M. Allen Son & Co. as a laborer in the construction of an extension of the St. Francis Hospital, in Peoria. On that day he was engaged in carrying sacks of cement, each weighing about ninety-eight pounds, from a large pile about eight feet high, which fell over on him, knocking him down and covering him. His back, neck and arm were hurt. He was in the hospital two and a half days, where he was treated by Dr. Wilson, and was afterward treated in his house by Dr. Wilson until August 5, when the doctor was of the opinion that he should be able to work and told him so. He did not go back to work because, as he testified, he was unable to work, but filed an application with the Industrial Commission for an award of compensation against his employer, W. M. Allen Son & Co. An arbitrator made an award of $18 a week for thirty-eight weeks' temporary total incapacity for work, $432 of which had been paid by the employer, leaving $252 accrued compensation, which the applicant was entitled to receive on November 12, 1930. Kelly filed a petition for review with the commission. Evidence was heard on this petition on February 14, 1931, in Chicago, and on March 10, 1931, the applicant's attorney was notified by the chairman of the commission that the petitioner must make an honest effort to work and in the meantime the case would be re-set at the next hearing in Peoria, when additional evidence would be heard referring to the phase suggested. A copy of the notice was sent to the attorney for the employer. On this further hearing the employer's attorney objected to the hearing of further evidence on the ground that the evidence had been closed

at the previous hearing, but the objection was overruled and Kelly and another witness testified as to his efforts to work since the previous hearing. No further testimony was offered by the employer, though Kelly and his witness were cross-examined. The commission set aside the award of the arbitrator and entered an award of $16.90 a week for 278 weeks and $11.80 for one week and thereafter a pension during life of $31.33⅓ a month. W. M. Allen Son & Co. sued out a writ of *certiorari* from the circuit court of Peoria county, which confirmed the award, and upon its petition a writ of error was allowed to review the record.

The contention of the plaintiff in error is that the finding that the applicant was totally and permanently disabled is not based upon competent evidence and that the decision of the Industrial Commission is contrary to law. We have frequently held that the burden rests upon the employee to prove the character and extent of his injury, and that it is the duty of the court to weigh the evidence in the record and to set aside the decision of the commission if it is without a substantial foundation in the evidence.

There is no disagreement about the occurrence of the accident, its character and the fact of an injury to the defendant in error, Kelly, but the plaintiff in error insists that the evidence does not justify an award for permanent total disability and that the law does not support it. Kelly was the only witness who testified in regard to the occurrence of the accident, and the only other witness in his behalf, except medical witnesses, was Fred Hanneman, who testified in regard to Kelly's effort to work on April 7, 1931, after the notice from the commission that he must make an honest effort to work. On the first hearing before the arbitrator two physicians, Dr. John Connell and Dr. Lloyd Kesling, were called and examined by counsel for Kelly. Dr. H. M. Wilson, Dr. James T. Jenkins, Dr. W. J. Roche and Dr. Harold A. Vonachen were called and examined by

the plaintiff in error. On the hearing before the commission on review (besides Dr. Connell) Dr. H. F. Diller, Dr. Sidney Easton and Dr. L. C. Ives testified for Kelly, and Dr. C. U. Collins and Dr. Hugh E. Cooper (besides Dr. Vonachen) testified for the plaintiff in error.

Kelly testified that he was fifty-four years old, five feet and four inches tall and that he weighed 121 pounds, having lost 10 or 12 pounds after the accident. He testified that he started to work when twelve or fourteen years old, at hard manual labor, and continued in that kind of work until his injury, never having had an accident other than a swollen or mashed finger before this injury. After the injury Dr. Wilson attended him until about August 6, when he discharged him as being able to go back to work, but he did not go back because he was unable to work. His back pained him all the time. His wrist and thumb and left side troubled him, making him stiff so that he cannot get up. His back gets no better. Sometimes the pain is sharp and shooting, and his side then hurts worse. He can stoop and come back unassisted. He can walk, and has walked from his home to the offices of various doctors who have examined him. His neck pains him all the time, drawing his head back. When he holds his head back it feels like it draws, back of his neck, down the side and down the back. There has been no change in that condition. His back below his neck aches and pains all the time and that condition is not changed. Sometimes it rests him to move around. When he attempts to bend, his back hurts worse. The pain is severe, and he does not sleep much at night because of the pain in his back and left side. His sleep is interrupted by sharp pain, and when he sits for any length of time there are pains in his back and side. He has not much strength. He dresses himself but does no work about his home. On March 10, 1931, he tried to chop some kindling in the basement with a small ax. He broke four or five pine boards. It caused severe pain in

his back and side and he quit and went up-stairs and lay down for a couple of hours. On March 12 he walked about five blocks to the bakery and back. He had to rest a couple of times against a fence on the way back, and after he got back home his back and side pained him. He kept a record of his condition from March 4, 1931, and testified that the record was made from his memory. A characteristic excerpt from this testimony is as follows: "I did not try to do anything on the 19th of March. I was up and around. I did not sleep any the night before. I sat around, and getting up, because my back pained me. I did not attempt to do any work on that day. My back was hurting me. On the 20th of March I carried about a half-bucket of water. I went and threw it out. I wrenched my back. I throwed the bucket and all. It was about a two-and-a-half-gallon bucket. It was about half full of water. I carried it from off the table in the kitchen. I left the bucket out in the yard. It hurt my back to carry the bucket. It gave me a terrible pain in my back and side. It was all I could do to throw the water out of the bucket, it pained my back and side so. I went back in the house and laid down for a couple of hours. I got up and walked around the house and sat around. My back hurt me all the time. On the 21st I did not try to do much of anything. I went down to the basement a couple of times and walked around. I did no work on that day. I tried to bend down. I bent, stooped over and got a saw and took it up-stairs and hung it up. I made a couple of trips down there. When I took the saw up-stairs it made my back and side pain." He further testified that on April 5 he walked about eight blocks and was all tired out when he got back home. On April 6 he did not sleep any all night and did not feel like doing anything. His back pained him. On April 7 he got up in the morning, got a little breakfast and went out to work about twenty or thirty minutes in the garden, and his back and side and neck got

to paining so he turned sick, and all of a sudden he fell down on the ground and one of his neighbors helped him to the house. He had been spading in the garden about thirty minutes. Before he fell his back hurt him severely. He did not know how he was taken to the house. Fred Hanneman took him in. He lay down for a couple of hours and stayed in the rest of that day and did not sleep that night.

Dr. Wilson attended Kelly first at the hospital for two and a half days, then at his home and afterward at the doctor's office until he discharged him as able to work, on August 5, 1930, but found no physical cause to which Kelly's condition could be attributed. He testified: This man has been injured as he described, by a fall of cement sacks. He complained of pain in the left shoulder and left arm, pain over the back, which was not localized, and some pain in the left upper abdomen. His examinations of Kelly consisted of testing the reflexes, palpation, urinal examination and general physical examination. In the physical examination the patient attempted to flex the body forward, backward, laterally, and to use his extremities. Palpation was used to determine whether there was any definite location or region of any pain, his blood pressure taken and the reflexes of the legs were observed. The pain was confined to the left shoulder and arm. The reflexes of the legs were normal at all times, and his ability to bend forward, laterally, was equal to, if not greater than, that of the ordinary man, and he was not particularly slow in doing it. In doing these tests they were not accompanied by any extensive pain but the pain at all times was scattered. On examination of the back there was no definite point of pain at any time. He came into the doctor's office in the neighborhood of thirty times and walked in and out again without any assistance. He was placed on a table for examination. The first time the doctor made an examination he had Kelly standing up, lying down, and examined him in a

chair in various positions. He would get on and off the table for examination practically the same as any other patient, without assistance. On examination of the legs the doctor found they were of equal size, no atrophy, no absence of reflexes, and to his knowledge pain was absent. He made no complaint of pain on his examination of the legs. There was no limitation of motion in the left shoulder articulations, and the temperature, pulse, respiration and blood pressure remained normal during this period. Dr. Wilson testified that he had X-ray pictures taken while Kelly was in the hospital and those plates did not show any pathology. The pictures taken were of the back. During the doctor's treatment he determined that Kelly had sustained a compression fracture of the third lumbar vertebra. That was in the last part of August.

After Kelly was discharged by Dr. Wilson as cured he consulted Dr. Kesling, who caused X-rays to be made of Kelly's back by Dr. Connell, a roentgenologist. These pictures showed a crushing fracture of the third lumbar vertebra and an osteoarthritis of the spine, fairly generalized throughout the whole. Dr. Kesling testified that by "compression fracture" is meant that the bony structure is so crushed that it is narrower than the vertebræ above and below. The inter-vertebral space is perfectly normal. There was apparently no pressure on the neural cord at the point of fracture. Dr. Kesling was not an X-ray technician and accepted the diagnosis of Dr. Connell that there was a fracture of the third lumbar vertebra. He testified that upon clinical examination he found various symptoms. Objectively, on palpation he found pain on the left costal region and in the back in the lower region. He found it more or less generalized over the abdomen. Those were the principal symptoms he found. He examined Kelly neurologically and in that examination he examined the reflexes of the feet, and they were normal. From his examination Dr. Kesling was of the opinion that Kelly was

not able to work. A hypothetical question was put to him, by which he was asked, assuming the facts included in the question, if he had an opinion whether or not there was any causal connection between the injury and the pain described in the hypothetical question. He answered that he had such an opinion, and his opinion was that there was a connection between them and that the condition was permanent.

We see no reason for entirely disregarding Kelly's testimony in regard to his condition, the pain he suffers and his inability to exercise any prolonged and sustained physical exertion, or the testimony of Dr. Kesling showing the condition of Kelly's fractured third lumbar vertebra and its sufficiency to account for the pain suffered by Kelly and his alleged permanent incapacity for work. The other physicians who testified had each made a personal examination of Kelly, and each testified as to the result of his examination and his opinion as to the capacity of Kelly to work. They are in direct conflict as to the freedom of motion of Kelly's body, as to the positive symptoms of pain and as to the effect of the compression fracture of the vertebra. Their testimony does not require or justify the rejection of Kelly's testimony. There is a conflict of opinion which cannot be reconciled. Some of the medical men are mistaken. The question of fact was for the commission to determine. While it is our duty to weigh the evidence heard by the commission, we have no right to substitute our judgment for the commission's unless we are satisfied that the finding of the commission is manifestly erroneous and has no substantial foundation in the evidence. We are not of that opinion. There is evidence in the record which, considered by itself, sustains the finding of the commission, and we cannot say that the evidence to the contrary is so clear as to show that the commission's finding is manifestly erroneous or without substantial foundation in the evidence.

The plaintiff in error shows that in putting the hypothetical question to Dr. Easton as an expert the defendant in error did not include in the hypothesis the fact, which appeared undisputed in evidence, that the defendant in error was able to, and did, walk to and from the offices of various doctors, and contends that there was therefore error in considering as evidence the answer of the doctor to the question. There is no merit in this contention. The doctor who was testifying had had the advantage of making a personal examination of the defendant in error and knew that he could walk, and the omission was not called to the attention of counsel at the time by apt objection.

The sixth assignment of error is that the judgment of the circuit court was erroneous in that it failed to recognize the payment of $432 which had been made by the plaintiff in error to the defendant in error, as is admitted of record. As was said in *Board of Education* v. *Industrial Com.* 308 Ill. 445, it was the duty of the commission to ascertain all such payments as had been made by the plaintiff in error before the award and to show the amount still due and to enter its order directing the payment of the amount due. The commission, however, did not even direct, as was done in the case cited, that the plaintiff in error be given credit for payments already made. It was error to confirm the award of the commission, which did not give credit for the amount already paid, but the facts found in the proceeding were such as to enable the court to render such judgment as is authorized by law.

The judgment is therefore reversed and the cause remanded to the circuit court of Peoria county, with directions to modify the judgment so as to direct that the plaintiff in error be given credit for $432 on the award.

*Reversed and remanded, with directions.*