(No. 22039.—

THE MONARK BATTERY COMPANY, Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(REBECCA LOCASTO, Defendant in Error.)

*Opinion filed December 22, 1933.*

WILSON & MCILVAINE, (J. F. DAMMANN, and SIDNEY K. JACKSON, of counsel,) for plaintiff in error.

ELLIODOR M. LIBONATI, and LEONARD GROSSMAN, (JOHN M. LONERGAN, of counsel,) for defendant in error.

Mr. JUSTICE STONE delivered the opinion of the court:

A writ of error has been granted in this cause to review the judgment of the circuit court of Cook county confirming an award on behalf of defendant in error, Rebecca Locasto, for the death of Mariano Locasto. The claim was filed by defendant in error under the Workmen's Compensation act on the ground that Locasto died from acute lead poisoning arising out of and in the course of his employment with plaintiff in error. Plaintiff in error contends that Locasto did not contract lead poisoning but that he died from other causes. This constitutes the principal question in the case.

Plaintiff in error is engaged in the manufacture and sale of storage batteries in the city of Chicago. The deceased was employed by the plaintiff in error between April 28, 1931, and May 13, 1931. On August 18 following he was again employed and worked until Septem-

ber 23, when he became ill and remained at his home until September 27, then resuming his employment and engaging therein until October 2, when he again became ill. He died on October 5.

Much testimony by medical witnesses was heard by the arbitrator, who found that Locasto came to his death by reason of lead poisoning which grew out of. and in the course of his employment, and made an award, as provided by the statute, on such finding. This award was confirmed on hearing by the commission and was later confirmed by the circuit court of Cook county.

The evidence shows that Locasto was first taken ill September 23, 1931; that he had never been sick prior to that time; that he suffered from hiccoughs and vomiting and complained of severe pain in his abdomen and was dragging his feet. The evidence of one witness for defendant in error was that Locasto's gums showed a blue line, though the family physician, Dr. Frank DiCosola, did not find such a symptom. He found soreness in the patient's limbs and abdomen, which latter pain would be relieved on pressure. He first visited the deceased on September 25. He again visited him on September 26 and for the third time on October 3. On October 4 the deceased was suffering from pronounced hiccoughs and vomiting and moved his legs but slowly, dragging his feet. On October 5 Dr. DiCosola was absent and a Dr. Leo was called in. Dr. DiCosola testified that in his opinion the deceased died of acute lead poisoning. He testified that his diagnosis was a suspicious case of lead poisoning. He testified he did not make a blood test of Locasto, which would have been of aid in making a correct diagnosis.

Dr. Sidney S. Greenspahn testified that lead poisoning may enter the body through the respiratory system or may enter by direct contact or absorption through the skin; that there is a characteristic lead line that usually manifests itself in the gums though it is sometimes not noticeable;

that there is a characteristic degenerative reaction of the blood vessels and heart muscles in lead poisoning, increased blood pressure and a moisture and pallor of the skin; that wrist-drop and toe-drop, as they are called, are symptoms of lead poisoning and are caused by the involvement of the nerve structures, and that hiccoughs and temperature are characteristic symptoms, together with pains in the stomach. He testified in response to a hypothetical question that there could be a causal connection between the occupation of the hypothetical individual and the symptoms embodied in the question and also between the occupation of that individual and his death. To a further hypothetical question which embodied the evidence concerning an autopsy showing growths on the leaflets of the aortic valve, portions of which had broken off and entered the blood supply of the heart muscles, thus causing a rupture in one of the heart blood vessels with an attendant area of hemorrhage, he answered that such facts tended to corroborate his original opinion as to the existence of lead poisoning, for the reason that an individual who has lead poisoning has a reaction in his blood vessels, causing a thrombosis and accumulation of blood at the region where there has been destruction of the vessels. He also testified that lead poisoning has a predilection for the heart tissues.

The evidence showed that the deceased during the greater part of his employment handled lead plates or grids which had been stamped out of lead. Much evidence was also given as to the method of manufacturing electric batteries, showing the use of lead metals and lead oxides, as well as a mixture of red lead, litharge and sulphuric acid worked into a paste. The testimony also shows that Locasto was at different times seen wearing a mask. He also worked in the plate-boxing department, which is in the same room with the paste-mixing department, and that he handled as high as twelve thousand pieces of lead in one day. The evidence shows that the factory was frequently

swept and that the floors were sprinkled preceding the sweeping. Deceased wore canvas gloves when handling the lead plates.

On behalf of respondent the testimony of three doctors was taken. Dr. J. M. O'Neill testified that he was connected with the Cook County Hospital on October 5, when deceased was brought there about noon; that at that time deceased was in extreme shock; that he was pale, pulseless, in a profuse perspiration and gasping for breath. The witness examined him and consulted one Dr. Rosa, who diagnosed the illness as coronary thrombosis. Dr. O'Neill testified that there was no evidence of lead line on the gums. He died within two hours after he was brought to the hospital. Witness testified that he was present at an autopsy, and that the findings consisted essentially of small generative growths on the leaflets of the aortic valve, portions of which had broken off and entered into the blood vessels of the heart muscles. He testified that the deceased did not have symptoms of lead poisoning.

Dr. S. R. Rosenthal testified that he performed the autopsy on the body of the deceased and found extensive hemorrhages in the conducting mechanism of the heart, due to an acute inflammatory process. He testified that the lungs and kidneys were normal, and that if lead poisoning were present the kidneys would have been affected; that death resulted from endocarditis; that the hemorrhage resulted from an infection, with a rupture of the blood vessels in the region of the heart, and that such could not be caused by poisons.

Dr. Edgar A. Degenhardt, the plant physician of plaintiff in error, testified that on the morning of October 2, 1931, he made a physical examination of Locasto, including blood-count examination, which revealed no evidence of toxic lead poisoning.

Under the rule often stated by this court, the burden is on the claimant to prove, by preponderance of competent

evidence, that the injury arose out of and in the course of the employment. (*Consolidated Coal Co.* v. *Industrial Com.* 325 Ill. 261; *St. Louis Smelting Co.* v. *Industrial Com.* 298 id. 272.) It is likewise the rule, often announced, that this court will not disturb an award of compensation unless it appears that the finding of the commission is manifestly erroneous. It is the purpose of the Compensation act that questions of fact are to be determined by the Industrial Commission. It is not the province of the court to substitute its judgment for that of the commission unless the court can see that the findings of the commission are clearly and manifestly against the weight of the evidence. (*Allen Son & Co.* v. *Industrial Com.* 349 Ill. 71; *County of Cook* v. *Industrial Com.* 327 id. 79; *Superior Coal Co.* v. *Industrial Com.* 318 id. 328.) In this case there is a sharp and direct dispute among the expert witnesses as to the existence of lead poisoning. If it did exist it is clear that the opportunity to contract it existed in the plant of the plaintiff in error, though the evidence shows that the deceased worked in plaintiff in error's plant but a short time. It is also shown that susceptibility to acute lead poisoning differs in different individuals, some contracting it within a short time, while others are able to work continuously under exposure to, but without contracting, lead poisoning.

The facts clearly shown by the evidence are, that deceased, healthy prior to September 23, was then taken ill and remained away for three days; that he had some of the symptoms which the testimony all shows are characteristic of lead poisoning; that he was again taken ill on the second of October and that he died three days thereafter. Two doctors were of the opinion that he died of lead poisoning. Three testified that in their opinion he did not have lead poisoning. Under such sharp disagreement of medical experts the lay mind is entirely unable to determine with nicety where the preponderance of evidence

lies. It cannot be said that where three expert witnesses testify in contradiction of two other expert witnesses, that fact alone shows that a finding in accordance with the opinion of the lesser number is manifestly against the weight of the evidence. It is argued that the witnesses for plaintiff in error were doctors of larger experience. In view, however, of the proved existence in the deceased of certain symptoms of lead poisoning, we are unable to say that the commission, whose duty it is primarily to pass on issues of fact, arrived at a conclusion manifestly against the weight of the evidence.

It is also argued that the award is based on incompetent evidence and therefore cannot stand. It is said that the hypothetical questions put to the doctors testifying for the defendant in error included facts not shown in the evidence, but, on the other hand, contrary to the evidence. We have examined the questions put to the witnesses for the defendant in error in connection with the testimony as shown in the abstract, and while they involve controverted questions of fact, the elements which the record shows the answers to have been based upon, appear in the testimony of defendant in error's witnesses. In the examination of an expert witness, where his opinion of a hypothetical case is sought, the party seeking the opinion may, within reasonable limits, state his hypothetical case as he claims it to have been shown by the evidence. (*Grand Lodge* v. *Wieting,* 168 Ill. 408.) The weight of such opinion is naturally affected by the weight of the testimony concerning the hypothetical case.

We are unable to say, on examination of the record, that the findings of the arbitrator and the commission are manifestly against the weight of the evidence. The circuit court therefore did not err in confirming the award, and its judgment will therefore be affirmed.

*Judgment affirmed.*