(No. 38834.—

LINDSAY-SCHAUB NEWSPAPERS, INC.; d/b/a CHAMPAIGN-URBANA COURIER, Appellant, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(SHELBY BECKRUM, Appellee.)

*Opinion filed March 18, 1965.*

PHILLIPS, PHEBUS & TUMMELSON, of Urbana, and KAVANAGH, BOND, SCULLY, SUDOW & WHITE, of Peoria, (HURSHAL C. TUMMELSON and D. J. BAYLER, of counsel,) for appellant.

MITCHEM AND HENDRIX, of Urbana, (CHARLES W. HENDRIX, of counsel,) for appellee.

Mr. JUSTICE HERSHEY delivered the opinion of the court:

This is an action under the Occupational Diseases Act brought by Shelby Beckrum, herein referred to as claimant, against Lindsay-Schaub Newspapers, Inc., his employer, alleging that claimant contracted lead poisoning, an occupational disease, in the course of his employment. The Industrial Commission awarded claimant compensation, and on *certiorari* the commission's finding was affirmed by the circuit court of Champaign County. The employer has appealed directly to this court, alleging that claimant suffered from multiple sclerosis and not from lead poisoning or any other occupational disease and that the judgment of the circuit court is against the manifest weight of the evidence.

There is no dispute concerning the nature of claimant's employment and the surroundings in which he worked. From 1948 to 1959 he worked as a lead pourer and janitor in employer's newspaper plant in Champaign. During part of this period he operated an "open pot" remelt furnace wherein used lead was remelted and the impurities "drossed" off. Claimant stirred the molten lead, skimmed off the impurities, poured the liquid lead into ingots and carried the ingots to another part of the plant after they had cooled. In his role as a janitor, he swept lead chips from the floor of the room where lead was cut by high speed saws. In short, he was in frequent and lengthy contact with lead in various forms during his employment.

There is sharp conflict as to the precise nature of the illness which claimant first developed in 1957. On February 2, 1957, he consulted Dr. Robinson, an eye specialist in Urbana. At that time he complained of headaches and double vision. Dr. Robinson referred claimant to Dr. Norris Brookens. Dr. Brookens testified that claimant complained further of numbness on his left side. The doctor proceeded to take a general history and perform physical and neurological tests. The neurological examination proved to be

negative except for the presence of double vision. Dr. Brookens also made laboratory tests on February 5, 1957 to determine the possibility of lead in the blood and urine. These test results were "within normal limits" and, in his opinion, ruled out the "possibility of either chronic or acute lead poisoning". He indicated that on one occasion he looked for discoloration of the gum line, commonly referred to as the "lead line" in medical parlance. A lead line is a symptom of lead poisoning but not of multiple sclerosis. On that occasion Dr. Brookens did not see a lead line. He stated, however, that it was difficult to identify the lead line in a colored person, claimant being a Negro. Dr. Brookens originally diagnosed claimant's illness as multiple sclerosis, but when he last treated claimant in July, 1958, he had some uncertainty about his diagnosis.

Claimant was also treated by Dr. Charles Moss, a general practitioner in Champaign. Dr. Moss first saw claimant in March, 1957, at which time he made a physical examination but did not know at that time that claimant worked with lead. His first diagnosis was that claimant was suffering from a brain tumor or multiple sclerosis. He made no laboratory tests or X rays and did not specifically examine claimant to see if he had a lead line. Dr. Moss stated that claimant exhibited symptoms of lead poisoning and that in his examination of claimant he "found nothing that would be inconsistent with my understanding of the symptoms of lead poisoning."

The record indicates that claimant was in and out of veterans' hospitals at Dwight and Danville on several occasions subsequent to 1957, and it appears that he received extensive medical attention while in these hospitals. No doctors from these hospitals testified although there was introduced in evidence a large number of clinical records and medical charts from these hospitals. Some of the records contained an apparent diagnosis of multiple sclerosis

although other reports were less definite, containing such terms as "chronic brain syndrome associated with disease of unknown or uncertain cause, multiple sclerosis and psychosis." One of the charts contained the legend "undiagnosed neurologic disease, manifested by weakness of the extremities and disturbance of the sense of balance."

On March 19, 1960, claimant went to see Dr. Phil Daly who had treated a number of patients for lead poisoning. Dr. Daly stated that upon examining claimant he found a lead line which he indicated was a "pretty good diagnosis of lead poisoning." Dr. Daly saw claimant only this one time and based his diagnosis at least in part on the history given him by claimant at a time when he was apparently mentally unstable.

On October 7, 1961, claimant was examined by Dr. Nathan Flaxman, a Chicago physician who had treated over 400 cases of lead poisoning. Dr. Flaxman testified that in an adult the presence of lead primarily affects the central nervous system and may be discovered in the urine and in some few cases in the blood. He further stated that a single test of blood and urine, such as that performed by Dr. Brookens, is of no significance and that a series of 24 such tests must be made over a period of time to obtain an accurate diagnosis. Dr. Flaxman was asked to assume certain hypothetical facts which were in every significant respect identical to the facts in this case. On the basis of those facts he concluded that the hypothetical man (claimant) had suffered lead poisoning. We do not agree with the employer's contention that the hypothetical question was improper for failure to accurately state the facts of the instant case.

Dr. Floyd Park, of Danville, in response to a hypothetical question testified that he was of the opinion that claimant did not have lead poisoning.

It is apparent that the medical testimony is conflicting

not only as to the correct diagnosis of claimant's illness but also as to the weight, if any, to be given to the several laboratory tests which claimant was subjected to. It seems clear, however, that claimant's symptoms would support a diagnosis of either lead poisoning or multiple sclerosis. It is also significant, we think, that one doctor discovered a lead line, which is a symptom of lead poisoning but not of multiple sclerosis.

The employer asserts that claimant's case is based in the main upon the testimony of two doctors who saw him for only a short time. This argument goes primarily to the weight to be given to the conflicting medical testimony. It is the function of the Industrial Commission to determine the facts and draw reasonable inferences and conclusions from the evidence. "This court will not weigh conflicting evidence and substitute its judgment for that of the commission. Our function is to determine whether the finding of the commission is against the manifest weight of the evidence. This court will not discard permissible inferences drawn by the commission merely because it might have drawn other inferences of fact." (*Clifford-Jacobs Forging Co.* v. *Industrial Com.* 19 Ill.2d 236, 245.) On the facts of the case we are of the opinion that the finding of the Industrial Commission was not against the manifest weight of the evidence. See *Monark Battery Co.* v. *Industrial Com.* 354 Ill. 494.

We conclude that the judgment of the circuit court of Champaign County confirming the decision of the Industrial Commission should be affirmed.

*Judgment affirmed.*