BETHLEHEM-SPARROWS POINT SHIPYARD INC. *v.* ADELAIDE BISHOP, ET AL.

[No. 4, October Term, 1947.]

*Decided November 3, 1947.*

The cause was argued before MARBURY, C. J., and DELAPLAINE, COLLINS, HENDERSON, and MARKELL, JJ.

*John G. Rouse, Jr.,* and *James C. Morton, Jr.,* with whom were *Ewing, Rouse & Morton* on the brief, for the appellant.

*Everett L. Buckmaster* and *Robert F. Skutch,* with whom were *Weinberg & Green* on the brief, for the appellees.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a judgment of the Superior Court of Baltimore City affirming an order of the State Industrial Accident Commission awarding compensation to the claimants. Jerome Bishop died on July 23, 1942. On August 7, 1942, claim was filed on behalf of his widow and a dependent minor child, on the ground that death was the result of an occupational disease contracted while the decedent was employed as a pipe-fitter by the appellant. After a hearing before one of the Commissioners, the claim was referred to the Medical Board for Occupational Diseases for report. On November 21, 1944, the Medical Board found upon the record of the prior hearing that the decedent "did not contract lead poisoning while in the employ" of the appellant. Upon petition to review this finding, the State Industrial Accident Commission remanded the case to the Medical Board, in order that the Board might "conduct the investigation, hearing and report contemplated by the statute." After further hearing, on March 21, 1945, the Board found that the decedent "did not die as the result of lead intoxication." Upon petition for review, the Commission, with two Commissioners sitting, on January 25, 1946, reversed the finding of the Medical Board, found that the decedent died "as a result of occupational disease resulting from lead poisoning to which he was last injuriously exposed while in the employ of" the ap-

pellant, and awarded compensation. The employer filed a motion for rehearing, which was heard by three Commissioners. On April 10, 1946, the motion was denied, one Commissioner dissenting. Appeals were entered from the award of January 25, 1946 and from the order of April 10, 1946. On motion, the Court dismissed the latter appeal. The employer did not pay the compensation awarded at that time, and claimants brought suit under the Speedy Judgment Act, Code Pub. Loc. Laws 1930, art. 75, sec. 312 *et seq*, as amended. The employer interposed a special plea under oath, contending that the award of January 25, 1946 was not final in that by the order of April 10, 1946, there was a correction made as to the date of decedent's death. The claimants then moved to dismiss the appeal from the award on the ground that the employer was estopped by having taken an inconsistent position in the suit under the Speedy Judgment Act. The Court overruled the claimants' motion, and, sitting without a jury, affirmed the award of January 25, 1946. From that judgment the employer appealed to this Court.

The appellees contend that the motion to dismiss should have been granted, but that in any event the award was properly affirmed. The appellant contends (1) that the Commission erred in reversing the finding of the Medical Board upon a medical issue, where there was evidence to support the Board's finding, and (2) that the Commission's award was improper because it was signed by only two Commissioners and contained no proper findings of fact.

We find no merit in the appellees' contention as to the motion to dismiss. The appellees rely upon the case of *Kramer v. Globe Brewing Co.*, 175 Md. 461, 2 A. 2d 634. In that case the corporate defendant pleaded to a common-law action for personal injuries, that the plaintiff was its employee, and that his remedy against it under the Workmen's Compensation Act was exclusive. The plaintiff thereupon dismissed his common-law action and filed a claim against the corporation under the Work-

men's Compensation Act, where he was met with a contention that he was not its employee. This court held that it was error to permit the corporate defendant, after having availed itself of an affirmative defense in the prior suit, and thereby induced a change of position on the part of the plaintiff, to deny the facts asserted in its special plea. We think the *Kramer* case is readily distinguishable. In the instant case, there was no admission of fact, but merely a contention that, as a matter of law, suit under the Speedy Judgment Act should have been based on the corrected order of April 10, rather' than the order of January 25. Because of a reasonable doubt upon this point, the employer had appealed from both orders. Moreover, there is no suggestion that the claimants suffered any detriment or were induced to change their position as a result of the plea. While the record does not disclose the outcome of the suit under the Speedy Judgment Act, the appellant states in its reply brief, and stated in argument without contradiction, that it has been and is now complying with the terms of the award, and as of September 19, 1947, had paid to the claimants the sum of $4,184.65 under the order now before this Court. Under the circumstances, we think the claim of estoppel is not well founded.

In order to determine whether the Commission properly reversed the finding of the Medical Board, it is necessary to state the evidence in some detail, although the facts are virtually undisputed. Bishop was first employed as a pipe-fitter at the Sparrows Point shipyard of the Bethlehem Steel Company in November 1936. At that time he was 26 years of age, in robust health, and weighed 156 pounds. He had previously worked as a truck-driver. He continued working as a pipe-fitter at the same plant when it was reorganized as Bethlehem-Sparrows Point Shipyard, Inc., in 1941. In April 1942, he transferred to the Bethlehem-Fairfield Shipyard, Inc., another subsidiary, where he worked as assistant foreman. During the entire period of his work at Sparrows Point, he worked in the engine rooms and holds of ships

where he was constantly exposed to the fumes of burning white and red lead. In the last two years before his death he lost weight, his skin became yellow, he complained of constipation, loss of appetite and nausea, pains in the stomach and giddiness, a bad taste in his mouth, and nervousness. He was treated for gastro intestinal trouble. At the time of· his death, at the age of 32, his weight·was 140 pounds. The terminal cause of death, as stated in the Coroner's report, was coronary thrombosis due to arteriosclerosis. There were also findings that the decedent had an "old stomach ulcer associated with considerable scar tissue," and that there was "marked congestion" of the stomach, liver and kidneys.

Dr. Paul Clough, an experienced physician connected with the Johns Hopkins Hospital, testified as an expert. He stated that in his opinion the premature arteriosclerosis which caused the coronary thrombosis was "probably the result of chronic lead poisoning." He stated that a gastric ulcer would have no appreciable effect upon the heart, but that pains in the stomach were a common symptom of lead poisoning. He stated that arteriosclerosis was rare in a person of the decedent's age, and would indicate an extraneous cause. He admitted that medical opinion was not wholly in accord as to the relation between lead poisoning and arteriosclerosis, but stated that "the consensus of opinion is that lead causes injury to the cells which are present in the walls of the blood vessels."

Dr. Charles Wood, who examined Bishop's lungs after the autopsy, stated that he found a deposit which made him suspicious of lead poisoning. He testified that chronic lead poisoning could have caused the heart condition. Medical text books in support of this theory were also offered in evidence.

Dr. Robert L. Graham, who performed the autopsy, stated that he found no evidence of lead poisoning, but admitted that he did not make any laboratory or other tests for it, since he was only interested in the terminal cause of death. He stated that the vascular changes he

observed were limited practically to the coronary artery. Assuming that some toxicant had been absorbed "if it were injurious to one vessel it should produce it more or less uniformly in other vessels, at least other vessels of the same caliber." He declined to express any opinion as to the causes of arteriosclerosis, or whether it could be caused by lead poisoning. He made it clear that he was testifying as a pathologist, not as an expert in that field.

The Medical Board declined to adopt the opinion expressed by Dr. Clough, and said: "Medical opinions, as many other opinions hallowed by long acceptance, die notoriously hard. The statement of the relationship of lead intoxication to arteriosclerosis has been perpetuated in text books for a great many years. The recent literature has critically examined this relationship and has to all intents rejected it." The Board found that Bishop "did not die as a result of lead intoxication."

Under the Compensation Act, as originally enacted, occupational diseases were not compensable, at least where they could not be brought within the category of accidental injuries. *Union Mining Co. v. Blank,* 181 Md. 62, 28 A. 2d. 568. In 1937, a bill (S. B. 276) was introduced in the General Assembly, at the instance of the Maryland Commission for the Study of Occupational Diseases, providing compensation for certain injuries of this type, under a different procedure from that prescribed for accidental injuries. The bill provided for a Medical Board to hear and pass upon cases involving medical issues, whose findings should be final. The bill expressly provided that "the Commission may not modify or change any report or findings of the Medical Board as to medical questions in cases involving occupational diseases." This bill failed of passage. An amended bill was reintroduced in its present form in 1939, and was duly adopted. Acts 1939, ch. 465. It expressly covered "lead poisoning or its *sequelae,*" Code, Art. 101, sec. 21. The Medical Board was empowered "to conduct hearings on medical questions, to determine medical issues and

to perform such other reasonable duties as the work of the Board may require." Code, Art. 101, sec. 27. The Commission was directed to refer every claim for compensation for an occupational disease, where there were controverted medical issues, to the Medical Board "for investigation, hearing and report." The Board was directed to "report in writing its findings and conclusions on every medical question in controversy" to the Commission, accompanied by the transcript of the testimony of all witnesses. Code, Art. 101, secs. 28, 29. Either the claimant or the employer or insurer were authorized to file a petition with the State Industrial Accident Commission, requestion it "to review the record and the proceedings before the Medical Board," whereupon the Commission was directed to "review the proceedings, findings and report of the Medical Board, and upon the record thus made shall render its decision or award upon all issues referred to the Medical Board. In any hearing, as provided for in Sections 21 to 30 of this Article, held by the State Industrial Accident Commission in any case to determine any controversial questions, no finding of fact by the State Industrial Accident Commission shall be subject to be reviewed or be set aside, reversed or modified." Code, Art. 101, sec. 29. With respect to appeal sec. 57 of Art. 101 provides: "in all appeals in which occupational diseases are involved, the findings of fact by the State Industrial Accident Commission shall be final and not subject to review or modification by the Court or be submitted to a jury."

We think these provisions are clear and free from ambiguity. The Commission has the power to review findings of the Medical Board. Finality, in so far as the legislature can make final the decision of an administrative tribunal, attaches to the decision of the Commission, not to the decision of the Medical Board. We find no merit in the appellant's contention that the Commission may not reverse the Board if there is substantial evidence to support the Board's findings.

The appellant relies upon *United States v. Dunton*, D. C. N. Y., 291 F. 905, 906. In that case the Federal Immigration Law, 8 U. S. C. A., sec. 153, provided for the appointment of "boards of special inquiry" by the Commissioner General of Immigration, with the approval of the Secretary of Labor. The decisions of these Boards were made final, subject to review by the Secretary of Labor. Proceeding under this Act, a Board of Special Inquiry admitted an alien, but its decision was reversed by the Secretary. In a *habeas corpus* proceeding before Judge Learned Hand, the Court said: "In this kind of case, although the court has nothing to do with the sufficiency of the proof, it may inquire whether the board had any basis in the evidence for their finding. * * * If so, the action of the Secretaary must be equally open to review, when he reverses the board. * * * His review is not confined to ascertaining whether there is any evidence to support the board; he exercises a power to examine the whole record and ascertain where the truth lies." The Court found that the Secretary of Labor decided the case upon the evidence not in the record and not properly before him. Without this evidence "there was no color for reversal, nothing but the most trivial inconsistencies. Therefore the reversal was unauthorized and the finding of the board should have been affirmed." We see nothing in the case to support the appellant's contention. The appellant also relies upon *Shields v. Utah Idaho Cent. R. Co.*, 305 U. S. 177, 59 S. Ct. 160, 165, 83 L. Ed. 111. But that case merely held that a decision of the Interstate Commerce Commission was subject to judicial review only to determine whether the Commission, after hearing, acted within its authority and "whether its finding had a basis in substantial evidence or was arbitrary and capricious." It was held that the District Court erred in permitting a trial *de novo*. This case may be compared with *Federal Radio Commission v. Nelson*, 289 U. S. 266, 53 S. Ct. 627, 636, 77 L. Ed. 1166, 89 A. L. R. 406, where it was charged that the Commission arbitrarily rejected that findings

of a chief examiner. The Court said: "the commission had the responsibility of decision and was not only at liberty but was required to reach its own conclusion upon the evidence."

The statute in the instant case clearly provides that the Commission's finding of fact shall be final on appeal, and not subject to review or modification by the court or submitted to a jury. The appellee does not contend that this provision would prevent review under any circumstances, but maintains that the award cannot be reversed or modified if there is evidence to support it. Upon the record before us, we think there was substantial evidence to support the finding of the commission. As we said in the recent case of *Bethlehem-Sparrows Point Shipyard v. Scherpenisse,* 187 Md. 375, 50 A. 2d 256, 259, "a medical expert is not barred from expressing an opinion merely because he is not willing to state it with absolute certainly. His opinion is admissible in evidence as to the cause which produced, or probably produced, or might have produced, a certain physical condition * * *." See also *Langenfelder v. Thompson,* 179 Md. 502, 507, 20 A. 2d 491, 136 A. L. R. 960. Indeed, upon the record before us, the opinions of Dr. Clough and Dr. Wood are virtually uncontradicted, and the Board's decision was obviously based upon medical literature not produced in evidence. Compare *Dembeck v. Bethlehem Shipbuilding Corporation,* 166 Md. 21, 27, 170 A. 158, and *Hyman v. Tyler,* 188 Md. 301, 52 A. 2d 610, 612. In any event, it is not the function of the court in this type of case to pass upon the weight of the evidence or resolve a dispute among expert witnesses. Compare *Monark Battery Co. v. Industrial Commission,* 1933, 354 Ill. 494, 188 N. E. 413.

The appellant contends that the Commission's award of January 25, 1946, was improper because signed by only two Commissioners. The answer to this contention is found in the statute, Code, Art. 101, sec. 2, which authorizes the three associate members "to hear and determine any hearing, trial, inquiry or investigation

which the Commission is authorized to hold or undertake; and any one of such other three members can preside alone at any such hearing, trial, inquiry and investigation, and every order and determination made by any one member shall be deemed to be the order or determination of the Commission." We think the review authorized by Section 29, as to controverted medical questions, may properly be included within the words "hearing" or "inquiry." It is only in the promulgation of rules and regulations that the Commission is enjoined by Section 2, to "act as a body." Even though the determination is made upon the record, the parties are entitled to notice and to be heard. While the Commission, in the order appealed from, did not review the evidence in detail, it made a specific finding that the decedent died "as a result of an occupational disease resulting from lead poisoning to which he was last injuriously exposed while in the employ" of the appellant. The only controverted medical issue was whether the terminal cause of death, coronary thrombosis, was in fact a *sequelae* of, or due to, lead poisoning. Under the circumstances of this case, we think the finding was sufficient.

*Judgment affirmed, with costs.*