DUNCAN *v.* McNITT COAL COMPANY ET AL.

[No. 67, October Term, 1956.]

388

*Decided March 1, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Clarence Lippel* for the appellant.

*Philip T. McCusker, Special Attorney,* with whom were *C. Ferdinand Sybert, Attorney General, U. Theodore Hayes* and *Ernest N. Cory, Jr., Assistants to the Special Attorney,* and *Thomas B. Finan* on the brief, for the appellees.

BRUNE, C. J., delivered the opinion of the Court.

The claimant, George Duncan, appeals from an order of the Circuit Court for Allegany County affirming a decision of the State Industrial Accident Commission (the "Commission") which disallowed a claim under the Workmen's Compensation Act for disability alleged to have been caused by an occupational disease, silicosis. The appellees are the appellant's employer, The McNitt Coal Company, and the State Accident Insurance Fund, the insurer.

The claimant was employed for forty years as a miner mostly by The McNitt Coal Company, but at times by other coal mining companies. During this period his work included digging coal, "shooting" rock and sanding rails. His working environment was extremely dusty, and he believed that the

dust to which he was exposed consisted largely of sand. He stopped work on June 24, 1955. Five or six years previously he noticed shortness of breath, which gradually became worse and towards the end of his working career he developed a cough, which caused him to spit black or yellow phlegm (from coal or sand dust, he supposed). His weight declined from about 220 to about 185 pounds.

The claimant first consulted a physician, Dr. Devers, on or about June 6, 1955. Dr. Devers examined him and suggested that he have an x-ray of his lungs made by the Allegany County Health Department, which was done on June 8th, at the Miners Hospital, Frostburg. The report of the County Health Officer, dated September 19, 1955, shows a negative tuberculin test and reports the examination of the x-ray taken on June 8, 1955, No. 15749, with the comments "Slight fibrosis throughout both lungs. Cardiac shadow normal." It seems (though it is not directly stated) that Dr. Devers examined this x-ray at about the time it was made and that on the basis of that x-ray and of physical examinations of Mr. Duncan on June 10th and 13th, Dr. Devers advised Mr. Duncan that he had silicosis and Mr. Duncan's claim was filed before the end of June.

Dr. Devers continued to see Mr. Duncan during the summer and prescribed some treatments for him, which produced little effect.

At Dr. Devers' suggestion, Mr. Duncan underwent various tests at the Sacred Heart Hospital in Cumberland, and an electrocardiogram was made during those tests on July 7, 1955. This was interpreted by Dr. Weisman, and his views were stated in Dr. Devers' testimony. Dr. Weisman's conclusion was that it was an abnormal electrocardiogram; his interpretation was as follows: "Low T waves are due to a vertical heart position and myocardial damage is probably present. Pulmonary heart disease cannot be supported or ruled out by this electrocardiogram." Other tests were also made at this time and their results were fully reported to the Medical Board by Dr. Devers at a hearing on Mr. Duncan's claim held on September 28, 1955. At that hearing Dr. Devers

explained that the low T waves commented upon by Dr. Weisman were due to a fact which was not known to Dr. Weisman, that Mr. Duncan was "decompensating" because of *cor pulmonale,* also known as right-sided heart disease. Dr. Devers commented that the electrocardiogram indicated that myocardial damage was probably, but not surely, present, and he dismissed the cardiogram with the statement that "I think anything you can say for [the] electrocardiogram is that it doesn't help at all."

A second x-ray of Mr. Duncan was taken at the Miners Hospital on July 19, 1955 (designated as Film No. 1704). This was read by Dr. W. O. McLane of Frostburg, who appears to have been recognized as an expert. His final interpretation was "early silicosis", as Dr. Devers stated in his testimony at the hearing before the Medical Board.

That hearing was held at the request of the insurer and of the claimant. The first and only specific issue upon which the matter was originally referred to the Medical Board, and the only one now important (others raised at the hearing not having been passed upon because of the decision on the first issue), was this: "Whether the claimant contracted an occupational disease within the meaning and terms of the Occupational Disease Law." Witnesses at the hearing were the claimant and Dr. Devers. No medical (or other) testimony was offered by the insurer. Dr. Devers was questioned extensively by members of the Medical Board with regard to the basis for his opinion that the claimant had silicosis. The Medical Board answered the first issue, "No." Its conclusion was contrary to that of Dr. Devers. Its report reflects consideration of what Dr. Devers had observed during his examination of the claimant, of the results of the hospital tests, and of the x-rays. The report stated in part:

> "The Medical Board examined x-rays submitted as evidence and interpreted them as follows: Film 1704, Miners Hospital, Frostburg, shows the lungs are clear; cardiovascular and other mediastinal structures appear normal. Film 15749, taken 6/8/55 by the Allegany County Health Department, shows the lungs

are clear; cardiovascular and other mediastinal structures appear normal.

"It is the opinion of the Board that this patient is suffering from arteriosclerotic heart disease which is not related to his occupation. This opinion is based upon the history, clinical and laboratory findings in association with negative x-ray study of the chest. The Board has considered the fact that this man has worked as a miner most of his adult life. However, there is no evidence to indicate his disease is due to silicosis."

At an earlier point in its report the Medical Board also stated: "Dr. Devers felt that the patient's symptoms were due to silicosis and myocardial failure, the latter on a basis of arteriosclerosis." The last portion of this statement appears to be erroneous, for Dr. Devers' testimony was to the effect that he considered the myocardial failure a result of *cor pulmonale* which, in turn, he ascribed to silicosis.

The claimant sought a review of the findings of the Medical Board by the Commission, and after a hearing the Commission affirmed the decision of the Board and disallowed the claim. The decision of the Commission was affirmed by the Circuit Court for Allegany County.

On the appeal to the Circuit Court and on the appeal to this Court the principal question presented is whether or not the Medical Board may apply its own expert knowledge and experience to the evidence before it, including x-rays, in determining whether or not the claimant is suffering from an occupational disease, and may make findings contrary to the express opinion of the only medical witness testifying before the Board.

Occupational diseases were first made compensable under the Workmen's Compensation Act by Chapter 465 of the Acts of 1939. That statute provided (*inter alia*) for the establishment of a Medical Board and prescribed its powers and duties. Then, as now (Code, 1951, Article 101, Section 26 (a)), the Medical Board was (and is) to consist of three members appointed by the Governor from lists of nominees submitted

by the respective Deans of the medical departments of the University of Maryland and of the Johns Hopkins University and by the council of the Medical and Chirurgical Faculty of Maryland. Two of the members must have had at least five years' practice in the diagnosis, treatment and care of industrial diseases, and one must be especially trained in roentgenology, with at least five years' practice and experience.

Under Section 27 of Article 101 of the Code of 1951 (to which Article subsequent references merely to Sections will refer, unless otherwise specified), the Commission is directed to refer "every claim for compensation for an occupational disease to the Medical Board for investigation, hearing and report, excepting, however, such cases wherein there are no controverted medical issues"; and the Commission is not permitted to make an award "in any such case until the Medical Board shall have duly investigated and heard the case and made its report and its decisions with respect to all medical questions at issue."

Section 27 also provides, among other things, for notice of a hearing before the Medical Board and that at "such hearing either party may offer testimony of such witnesses as they may desire, which shall become a part of the record of the proceedings before the Medical Board." There are also provisions for the appearance of the claimant and for his submission to such examinations, including clinical and x-ray examinations, as the Medical Board may require and for the presence at and participation in any such examinations of physicians representing the claimant, the employer and the insurer, respectively. No new examination was required by the Medical Board in the instant case, and reports of clinical and x-ray examinations were those already made as to which Dr. Devers testified and as to which he was questioned by members of the Board.

The concluding paragraph of Section 27 requires, *inter alia,* that the "Medical Board shall, as soon as practicable after it has completed its consideration of the case, report in writing its findings and conclusions on every medical question in controversy" and that it "shall also include in its report a statement indicating the physician or physicians, if any, who ap-

peared before it, and what, if any, medical reports and X-rays were considered by it." The first paragraph of Section 28 further requires the Medical Board to file with the Commission the record of all proceedings before the Board, including the transcript of the testimony of all witnesses.

Section 28 of Article 101, as amended by Chapter 82 of the Acts of 1955, also makes provision for review of the proceedings and decision of the Medical Board by the Commission. It provides in part: "In the event that a petition for review by the State Industrial Accident Commission of the findings and report of the medical board has been filed, * * * the State Industrial Accident Commission shall review the proceedings, findings and report of the medical board, and upon the record thus made shall render its decision or award * * *." From June 1, 1939, until June 1, 1951, this sentence in the corresponding Section (numbered 42) of the 1939 Code read (apart from capitalization) just as it now does. From June 1, 1951, until June 1, 1955, a proviso was attached to this sentence which read as follows: "provided, however, that upon such review the findings of the Medical Board upon all medical questions shall be presumed to be correct and such findings shall not be set aside or reversed if there is legally sufficient evidence in the record to support such findings." This was eliminated by Chapter 82 of the Acts of 1955.

Most of the rules of law applicable to this case have been set forth in *Big Savage Refractories Corp. v. Geary,* 209 Md. 362, 121 A. 2d 212, decided in 1956, in which Judge Collins carefully reviewed a number of prior decisions of this Court. It seems useless to repeat here to any great extent what was well said there. That case arose while the proviso giving great effect to the findings of the Medical Board was in force, and it was decided thereunder. The opinion pointed out that since the effective date of Chapter 82 of the Acts of 1955, the law with regard to the determination of facts in cases involving occupational diseases has been restored to what it was prior to June 1, 1951, and what it was when *Bethlehem-Sparrows Point Shipyard, Inc. v. Bishop,* 189 Md. 147, 55 A. 2d 507, and *Consolidation Coal Co. v. Porter,* 192 Md. 494, 64 A. 2d 715, were decided.

Under Section 28 of Article 101 of the Code, the Commission, on a petition for review, "shall review the proceedings, findings and report of the Medical Board, and upon the record thus made shall render its decision or award upon all issues referred to the Medical Board." Then follows a provision, which is substantially duplicated by a proviso contained in what is now Section 57 of the same Article to the effect that findings of fact by the Commission in cases involving occupational diseases are not to be set aside, reversed or modified on review in the courts. Notwithstanding the finality which these statutes seek to confer upon such findings of the Commission, they are subject to review if not supported by substantial or legally sufficient evidence (both terms being found in the cases), and the existence of such evidence is a question of law. *Johnstown Coal & Coke Co. v. Dishong,* 198 Md. 467, 84 A. 2d 847; *Big Savage Refractories Corp v. Geary, supra; Moore v. Clarke,* 171 Md. 39, 187 A. 887; *Kelly-Springfield Tire Co. v. Roland,* 197 Md. 354, 79 A. 2d 153; Note, 13 *Md. Law Rev.* 337. See also *Lloyd E. Mitchell, Inc. v. Md. Employment Security Bd.,* 209 Md. 237, 121 A. 2d 198, involving similar provisions of the Unemployment Compensation Act (Code, 1951, Article 95A, Section 6 (h)).

In *Bethlehem-Sparrows Point Shipyard, Inc. v. Bishop, supra,* this Court said: "The Commission has the power to review findings of the Medical Board. Finality, in so far as the legislature can make final the decision of an administrative tribunal, attaches to the decision of the Commission, not to the decision of the Medical Board." (189 Md. at 154, 55 A. 2d at 511.) The review of the origin and legislative history of Chapter 465 of Acts of 1939 set forth in Judge Henderson's opinion in *Bethlehem-Sparrows Point Shipyard, Inc. v. Bishop, supra,* is pertinent here. His view there stated is reinforced by the 1951 and 1955 changes which, respectively, first inserted and later removed the proviso in Section 28 which gave added force to the findings of the Medical Board; and it is clearly the decision of the Commission, not of the Medical Board, which is now under review.

However, since the Commission's finding in this case is explicitly based upon the findings of the Board, if there was no

legally adequate foundation for the Board's findings, such an infirmity would doubtless vitiate the Commission's findings as well.

What, then, is the position of the Medical Board? Is it an investigator and advisor for the Commission in the field of occupational diseases, or is it merely an umpire in case of a dispute between medical experts? The need for expert medical advice in passing upon the existence and extent of occupational diseases seems clear, and we think that the pertinent statutory provisions indicate that the Medical Board is intended to be more than the arbiter of disagreements between medical experts.

We note that the statute which made occupational diseases compensable created the Medical Board simultaneously with creating the right to compensation. We also note that the Board was and is a body of experts, and that its investigations and its findings based thereon constitute essential parts of the process by which the right to compensation because of an occupational disease is to be established. Under Section 27 the Commission is required to refer such claims for compensation to the Medical Board "for investigation, hearing and report, excepting * * * such cases wherein there are no controverted medical issues," and no award may be made "until the Medical Board shall have duly investigated and heard the case and made its report and its decisions with respect to all medical questions at issue." By Section 28, the Commission is required to review the report and findings of the Medical Board upon all issues referred to that Board.

In the instant case both the claimant and the insurer asked for a hearing, and the insurer asked that the issue be determined as to whether or not the claimant had contracted an occupational disease within the meaning and terms of the Occupational Disease Law. A medical issue thus was "controverted" within the meaning of Section 27 even though neither the employer nor the insurer called any medical witness to testify in opposition to the claimant's medical witness. We do not understand that the claimant takes a position contrary to this view.

On the other hand, he contends in his brief that there is

no controversy as to medical facts or as to the inferences to be drawn therefrom in this case. His position is thus stated: "* * * that where the evidence is conflicting or where inferences from the evidence are susceptible of different interpretations it is the responsibility of the Board in the first instance and the Commission on review to resolve the conflict and render its decision accordingly. But *where the evidence and inferences are undisputed, as they are in the instant case,* the Commission is bound by them and must render its decision solely on the facts before it. It is not legally permissible for the Board or the Commission to substitute its own judgment for undisputed facts." (Italics ours.)

The first weakness of this statement, we think, is that it assumes that no inferences can be drawn from the medical evidence other than those drawn by the claimant's physician.

We are struck at once by the fact that Dr. Devers discounted completely the electrocardiogram, though the Board seems to have attached importance to it. Dr. Devers did so on the ground that the doctor who interpreted it was not informed of an essential fact. No explanation is offered as to why he was not informed of it, yet the examination and tests of which it formed a part were undertaken at the instance of the claimant or his physician, or both.

Next we note that the diagnosis made by the Health Department based upon a negative tuberculin test and an x-ray is "Possible slight silicosis," and that the interpretation of the second x-ray is reported as "early silicosis." How much disability, if any, would be the probable result of such silicosis as the x-rays indicated is not shown.

A reading of the entire testimony and of the questioning of Dr. Devers by members of the Board suggests what we think the report of the Medical Board shows—that the Board did in fact draw different inferences from the medical data before it from those which were drawn by the claimant's physician.

It might be that in some cases the medical data and the inferences which could be drawn therefrom would point to one and only one conclusion, and a situation might thus be presented similar to that in which a directed verdict or a summary judgment would be appropriate. This does not seem to

be such a case. In this case, to preclude the Medical Board from applying its own expert knowledge to the data before it simply because no medical witness appeared to offer testimony controverting the deductions, conclusions or opinions of the only medical witness or witnesses whose views were offered in evidence would, we think, confine the functions of the Medical Board within narrower limits than those contemplated· by the statute and would tend to defeat what we think was an evident purpose of the statute—to have difficult medical questions as to the existence and effect of occupational diseases considered by a group of medical experts who should use their expert knowledge in investigating such claims and in reporting their findings thereon to the Commission to aid it in reaching its ultimate decision.

It is true, as the claimant urges, that members of administrative bodies may not rest their decisions on matters of private knowledge which are not in evidence. See, for example, *Hedin v. Board of County Commrs.,* 209 Md. 224, 120 A. 2d 663. We think, however, that this does not preclude the members of the Medical Board from applying their expert knowledge to the medical evidence before them. *Big Savage Refractories Corp. v. Geary, supra.* In that case, as in this, x-rays pertinent to the existence of silicosis and an electrocardiogram were involved. Recognition of the Board's right to use its expert knowledge is implicit, if not, indeed, explicit, in the opinion of this Court in that case. At page 371 of 209 Md., page 217 of 121 A. 2d, Judge Collins said: "* * * The Legislature therefore sought to make certain that the members of the Medical Board were experts on occupational diseases. *Johnstown Coal & Coke Co. v. Dishong, supra,* 475. The Medical Board, in addition to its expert findings that the possibility of early silicosis was not to be excluded and that the silicotic findings were not the cause of the appellee's disability, found that the cardiac disease present was the most likely cause of disability."

Though the opinion then went on to say that the Board's "expert findings" were supported by the report of one of the claimant's own physicians, we do not think that the Board's right to apply its expert knowledge to the medical evidence

before it was regarded as being dependent upon support for its views from the opinion of any physician whose opinion or findings were submitted to the Board. We find no satisfactory reason for permitting the Medical Board to use its own expert knowledge for the purpose of resolving conflicts of opinion among other experts and at the same time for denying it the right to use its same expert knowledge in testing the sufficiency of the evidence offered by only one side to establish a fact which that side must prove in order to establish its claim. We accordingly hold that the Medical Board may apply its expert knowledge to the medical evidence before it and may base its findings and report to the Commission upon such application of such knowledge, whether or not there is medical opinion evidence in the record before the Board in accordance with or at variance with the Board's findings.

We also think that there was medical evidence to which the Board could apply its expert knowledge to arrive at the findings made. We hold this view even though (1) the Board seems to us to have been in error in ascribing to Dr. Devers the view that the claimant's myocardial failure was due to arteriosclerosis, and (2) we, as medical laymen, might think "no sufficient evidence" a preferable term to "no evidence" in the Board's statement that "there is no evidence to indicate his [the claimant's] disease is due to silicosis." The Board flatly stated the opinion "that this patient is suffering from arteriosclerotic heart disease which is not related to his occupation." It added: "This opinion is based upon the history, clinical and laboratory findings in association with negative x-ray study of the chest." We cannot say that these findings of the Board furnished no legally sufficient evidence to support the Commission's finding of fact based thereon, that the claimant did not contract an occupational disease within the meaning and terms of the Occupational Disease Law. Nor can we say that the Board's apparent error or possible overstatement above mentioned rendered them unavailing as the basis for the Commission's ultimate decision. Since the Board very evidently disagreed with Dr. Devers' basic view that silicosis was the cause of the claimant's disability, we think

that the Commission might well have inferred that the Board did not rely to any material extent, if at all, upon its erroneous belief that Dr. Devers thought the claimant's heart trouble was due to arteriosclerosis.

A further objection which the claimant raises to the Board's placing its own interpretation upon reports of clinical observations, x-rays and the like is that this permits the Board to operate free of all restraint of cross-examination and thus to exercise virtually uncontrolled and arbitrary power. He relies particularly upon *Dembeck v. Bethlehem Shipbuilding Corp.,* 166 Md. 21, 170 A. 158. In that case, which was an accident case, the Commission had its own medical examiner and adviser examine the claimant after the taking of testimony had been completed and the Commission received and considered his report before making its own determination. At the time when that case was decided, an appeal from the Commission was tried in court only on the record before the Commission. The report of the Commission's medical director was held to have been improperly made a part of the record on appeal. Judge Digges, speaking for this Court, pointed out that though the claimant had knowledge of the examination because he submitted himself to it, yet the report of the result of the examination was not made at a public hearing at which either the claimant or his counsel was present, and further that no opportunity was afforded to interrogate the doctor or to cross-examine him with regard thereto. This was held not to meet the requirements of due process.

This holding of the *Dembeck Case* was cited with approval and was followed in *Bethlehem-Sparrows Point Shipyard, Inc. v. Damasiewicz,* 187 Md. 474, 50 A. 2d 799, in which a ruling of the trial court was upheld which excluded testimony intended to show that the Commission's medical examiner had made a report prior to the award. Judge Delaplaine said (187 Md. at 477, 50 A. 2d at 801): "If such a report is in the record, justice requires that any of the parties should be afforded the opportunity to show that the information therein is in fact not true." See also for a kindred situation under zoning laws, *Temmink v. Bd. of Zoning Appeals of Baltimore County,* 205 Md. 489, 109 A. 2d 85, and a later stage

of the same litigation under the same name in 212 Md. 6, 128 A. 2d 256.

The compensation cases above cited might possibly be more persuasive in the instant case if the proviso which was in Section 28 from June 1, 1951, until June 1, 1955, were still there. As the statute now stands, however, a party aggrieved by the findings of the Medical Board may seek a review thereof by the Commission, without being confronted by the presumption of correctness of the Board's findings on medical questions and by the prohibition against its findings being set aside or reversed "if there is legally sufficient evidence in the record to support such findings."

It is true that there is no provision for cross-examining the members of the Medical Board as to why they reached a conclusion on the medical evidence before them opposite to that of the claimant's doctor. Cross-examination of members of an administrative agency as to the mental processes by which they arrived at a conclusion, or as to their expert knowledge which may have entered into their decision is not a part of normal administrative procedure. The Medical Board's position is not precisely that of an administrative agency empowered to reach ultimate conclusions of fact, yet it is certainly no less than that of a trial examiner in administrative proceedings or of a master in equity or other court proceedings. Its views stand or fall on its report as submitted to the Commission and the Board's report must be made on the basis of the evidence before it and its expert interpretation thereof. On the other hand, the Board's report shows that they considered the same record or documentary evidence, including the x-rays, as did Dr. Devers. That evidence also included his notes on his examinations of the claimant, and the Board also had the benefit of his oral testimony. Whether the Medical Board or Dr. Devers drew the right conclusions from the evidence was the question squarely before the Commission. The claimant had a right to a hearing before the Commission on this question and he exercised it. We have no doubt that objections to the sufficiency of the evidence to support the Board's findings and objections to the accuracy of its findings which were ably presented by the claimant's

counsel in this Court were equally ably presented to the Commission. That is the body to which the determination of the facts as to occupational diseases has been committed (so far as possible) by the Legislature, and the power of the courts to review such findings is definitely limited, as we have already noted. It is proper to vest primary responsibility for the determination of such facts in an administrative body. See *Crowell v. Benson,* 285 U. S. 22, 46-47; *Scherr v. Braun,* 211 Md. 553, 128 A. 2d 388; *Burke v. Fidelity Trust Co.,* 202 Md. 178, 96 A. 2d 254, and cases therein cited. The question before us is not whether we should have arrived at the same conclusion on the same evidence, but whether the evidence was sufficient to sustain the conclusion of the Commission. *Johnstown Coal & Coke Co. v. Dishong, supra.*

Essentially, we think that this case is controlled by *Big Savage Refractories Corp. v. Geary, supra,* as to the power of the Medical Board to exercise its own knowledge and experience in considering medical questions and in making its report thereon to the Commission, that the Board's findings so made were supported by legally sufficient evidence and in turn furnished legally sufficient evidence to support the ultimate finding of the Commission adverse to the claimant and that we must therefore affirm the order appealed from.

*Order affirmed, with costs.*