ARMCO STEEL CORPORATION *v.*
HERBERT R. TRAFTON

[No. 932, September Term, 1976.]

*Decided April 14, 1977.*

The cause was argued before MENCHINE, DAVIDSON and LOWE, JJ.

*William R. Levasseur* and *Rignal W. Baldwin, Jr.*, with whom were *Semmes, Bowen & Semmes* on the brief, for appellant.

*R. Roger Drechsler*, with whom was *David Kimmelman* on the brief, for appellee.

MENCHINE, J., delivered the opinion of the Court.

Herbert R. Trafton (Claimant) filed a claim against Armco Steel Corporation (Armco or Employer and Self-Insurer) for workmen's compensation benefits. The claim asserted entitlement to benefits for disability (hearing loss) caused by occupational disease [1] arising out of and in the course of his employment.

The claim was referred to the Medical Board for Occupational Diseases [2] (Medical Board), and a hearing was conducted by that body. After hearing, the Medical Board made the following decision:

> "In view of the testimony and medical reports and the sound level survey and considering the length of time this employee was exposed to high noise levels in his employment with the Armco Steel Corporation, it is the opinion of the Medical Board that this claimant does, indeed, have an accoustic trauma as a result of his occupation with the Armco Steel Corp.

---

1. Article 101, § 67(13) reads as follows:

   " 'Occupational disease' as used in this article shall mean the event of an employee's becoming actually incapacitated, either temporarily, partially or totally, because of a disease contracted as a result of and in the course of employment, as provided in § 22 of this article."

Occupational hearing loss is an occupational disease. Belschner v. Anchor Post Products, Inc., 227 Md. 89, 175 A. 2d 419 (1961); Article 101, § 25A.

2. Created by Article 101, § 27.

Based on the report of Dr. Gerlach, he is entitled to 45% binaural hearing loss.

ISSUES RAISED ARE AS FOLLOWS:

1. Did the employee sustain an accidental personal injury arising out of and in the course of employment.
2. Is the disability of the employee the result of an accidental personal injury arising out of and in the course of employment.
3. Should claim be determined by Medical Board.
4. Is the alleged occupational deafness a result of an accidental personal injury arising out of and in the course of employment.
5. Such other and further issues as may be raised at time of hearing.

MEDICAL BOARD DECISION:

1. He did not have an accidental injury but he did sustain an occupational disease.
2. See answer to issue #1.
3. Yes.
4. See answer to issue #1.
5. No other issues raised at the time of this hearing. However, the Medical Board raised the issues of nature and extent. Patient has a 45% binaural hearing loss as a result of an occupational disease in his employment with the Armco Steel Corporation."

Pursuant to the provisions of Article 101, § 29, Employer and Self-Insurer filed a petition for review [3] by the

---

3. Section 29 provides in part as follows:

"... In the event that a petition for review by the Workmen's Compensation Commission of the findings and report of the medical board has been filed, as herein provided, the Workmen's Compensation Commission shall review the proceedings, findings and report of the medical board, and upon the record thus made

Workmen's Compensation Commission (Commission) of the findings and report of the Medical Board.

After hearing and review the Commission passed an order reading, in pertinent part, as follows:

"... after due consideration, the Commission affirms the decision of the Medical Board and finds that the claimant did sustain an occupational disease arising out of and in the course of his employment on January 2, 1974 and as a result thereof, he sustained a permanent partial disability resulting in 45% binaural hearing loss. ..."

On appeal to the Superior Court of Baltimore City by the Employer and Self-Insurer, the decision of the Commission was affirmed.

Employer and Self-Insurer now has appealed to this Court, contending:

1. That the finding of the Medical Board and its affirmance by the Commission is not supported by legally sufficient evidence.

2. That the disability rating of occupational deafness was not determined in accordance with law.

### Sufficiency of Evidence

Unlike appeals from the Commission in cases of accidental injury, the Legislature has seen fit narrowly to circumscribe the power of the courts in appeals from the Commission respecting the grant or denial of benefits for occupational disease. Article 101, § 56 reads in pertinent part as follows:

"... in all appeals in which occupational diseases are involved, the findings of fact by the Commission shall be final and not subject to review

---

shall render its decision or award upon all issues referred to the medical board. In any hearing, as provided for in §§ 22-30 of this article, held by the Workmen's Compensation Commission in any case to determine any controversial questions, no finding of fact by the Workmen's Compensation Commission shall be subject to be reviewed or be set aside, reversed or modified."

or modification by the court or be submitted to a jury. . . ."

Armco's contention is grounded upon its assertion that there is no medical evidence directly connecting the hearing loss with the employment and no other evidence sufficient to establish the necessary causation.

The course to be followed by an appellate court in considering the legal sufficiency of the evidence in occupational disease cases was plainly outlined in *Duncan v. McNitt Coal Co.*, 212 Md. 386, 129 A. 2d 523 (1957), in the following language:

> "It is true, as the claimant urges, that members of administrative bodies may not rest their decisions on matters of private knowledge which are not in evidence. See, for example, *Hedin v. Board of County Commrs.*, 209 Md. 224, 120 A. 2d 663. *We think, however, that this does not preclude the members of the Medical Board from applying their expert knowledge to the medical evidence before them. Big Savage Refractories Corp. v. Geary, supra.* In that case, as in this, x-rays pertinent to the existence of silicosis and an electrocardiogram were involved. Recognition of the Board's right to use its expert knowledge is implicit, if not, indeed, explicit, in the opinion of this Court in that case. At page 371 of 209 Md., page 217 of 121 A. 2d, Judge Collins said: ' * * * The Legislature therefore sought to make certain that the members of the Medical Board were experts on occupational diseases. *Johnstown Coal & Coke Co. v. Dishong, supra*, 475. The Medical Board, in addition to its expert findings that the possibility of early silicosis was not to be excluded and that the silicotic findings were not the cause of the appellee's disability, found that the cardiac disease present was the most likely cause of disability.'
>
> "Though the opinion then went on to say that the Board's 'expert findings' were supported by the

report of one of the claimant's own physicians, *we do not think that the Board's right to apply its expert knowledge to the medical evidence before it was regarded as being dependent upon support for its views from the opinion of any physician whose opinion or findings were submitted to the Board. We find no satisfactory reason for permitting the Medical Board to use its own expert knowledge for the purpose of resolving conflicts of opinion among other experts and at the same time for denying it the right to use its same expert knowledge in testing the sufficiency of the evidence offered by only one side to establish a fact which that side must prove in order to establish its claim. We accordingly hold that the Medical Board may apply its expert knowledge to the medical evidence before it and may base its findings and report to the Commission upon such application of such knowledge, whether or not there is medical opinion evidence in the record before the Board in accordance with or at variance with the Board's findings.*" (Emphasis added.) 212 Md. at 398-99, 129 A. 2d at 529-30.

### The Evidence in the Subject Case

The Claimant testified that he had been employed by Armco for twenty-seven years. He worked as a towmotor operator until March 1974, when he was transferred to do janitorial work. He testified that he had no hearing loss prior to the commencement of his work at Armco and noticed the beginning of a hearing loss fourteen or fifteen years ago. At the time of the hearing before the Medical Board, Claimant could hear nothing without a hearing aid. He thus described the noise generated in the operation of the towmotor itself:

"Q  All right, now. Is there anything unusual about the lift type truck that you are operating for these 23 years?

A  A whole lot. Most of the time they got racks up over top to protect you and they don't keep them tight sometimes, they can't hear anything.

Q  Well, now, what unusual noises, if any, do you hear as a result of operating the lift truck?

A  Well, just iron knocking against iron. Iron hitting against iron.

Q  And, how often, how many hours do you usually work a day?

A  Eight hours.

Q  You usually work five days a week?

A  That's right. Sometimes six and seven.

Q  All right. And, how often would you hear the iron rattling against other iron?

A  Well, if I'm driving all day.

Q  All day?

A  That's right.

Q  When you hear it while you're moving or when you're standing still?

A  When I move. Then when I stand still, it gives a lot of vibration.

Q  The vibration keeps on rattling?

A  Uh-huh.

Q  And, during the period of time you were operating this Towmotor or lift truck, are you driving it or are you sitting as a passenger?

A  I'm driving it.

Q  You drive it. And, when you actually lift up the item or metals, do you actually sit in the driving seat when you do it?

A  That's right. That's right.

Q  Well, do you ever get out of the lift, the tow truck, Towmotor?

A  Well, I hardly ever get out. Just if it falls off, sometimes I pick it up.

> Q   All right. After you lift metal up, do you then drive it to a new destination or location?
>
> A   That's right. Most all them places are noisy there."

In addition to the noise connected with operation of the towmotor itself, Claimant testified that he worked indoors and out "around furnaces where there is a lot of noise, around grinder shields." He added that a towmotor driver does not work in one place, he goes every place in the plant. "[I] work around grinding shed, hauling in and out of there. That makes a whole lot of noise ... I have worked up the hammer job where they got to hammer. That's a whole lot of noise ... They have a press shop now ... been round the blacksmith's shop. That keeps noise ... That's about the most noise there is .... Work down the wire more. The people keeps a whole lot of noise."

Claimant testified that he lived in a residential neighborhood and was not subjected to any loud noise other than that to which he was subjected by his employment.

Armco's job description of a towmotor operator under the heading "Surroundings" contained the following comment:

> "All weather conditions where weather may be severe and exposed to heat for intervals and *intense noise* for periods." (Emphasis added.)

A routine report of a physical examination of claimant, by a company doctor on May 23, 1961, carried a negative notation after the inquiry "Auditory Acuity Diminished (Spoken Voice)."

A similar report of an examination on January 28, 1969, carried an affirmative notation after the identical inquiry.

A similar report of an examination on February 9, 1973, carried, *inter alia*, the following comment under the heading "Summary": "Severe hearing defect."

A medical report of the Employer and Self-Insurer, dated

May 2, 1973, headed "Non Occupational" in decipherable part contained the following pertinent data:

"History: Sent up by foreman for audiogram testing due to marked loss of hearing. Testing done showed loss of L 40-95 dib loss in all ranges. R40-65 dib loss in all ranges. Has hearing loss since 1961. In 1970 was seen by otologist who advised removal of adenoids to improve hearing but employee reluctant to do this.

Examination: Both ears essentially neg. . . . No infection.

Audiogram: Left ear 40-95 dib above normal in all ranges
Right 40-65 dib abnormal in all ranges"

Other records offered by Armco, in parts pertinent and decipherable, were as follows:

"1-24-74 On routine P.E. Employee claims he uses hearing aid at home for past several months. To take another audiogram w/ & w/out aid.

1-25-74 Audiogram done today. Has minimal impairment of hearing. With . . . of hearing . . . to left ear. Impment of 5-35 dib only.

At Mr. Green's request made appt. for employee to see Dr. Gerlach (Ear Specialist) on 1-28-74.

1-28-74 To & from Dr. Gerlach's office via station wagon.

Next appt. on 2-4-74 at 1:30 p.m. — was given prescription for ear gtta to instill in right ear Tid.

Phoned Mr. Green as to who would be paying for Dr. Gerlach's visit as well as

prescription — He stated that we wanted an evaluation so therefore we would pay the costs, however if further treatments needed patient would have to pay costs of these.

2-4-74  To and from Dr. Gerlach's office via station wagon. Patient states Dr. was unable to do hearing test again today. Next appt. on 2-11-74 at 2:30 p.m.

2-4-74  Called Dr. Gerlach. Examined Trafton. Has Rt otic perforation of Tympanic membrane probably dating since childhood? No infection. A lot of . . . Had to complete debridement today and continue drops until next visit when evaluation will be done.

Left ear — intact

Mr. Green notified.

2-11-74  To and from Dr. Gerlach's office via station wagon.

3-15-74  Phoned Dr. Gerlach's office requesting letter of his evaluation & secretary stated we should have it shortly.

3-20-74  Rec'd statement from Dr. Gerlach

1-29-74 Exam and Debridement $ 35.00
2-4, 2-11 Office visits — Treatment 40.00

$ 75.00

Sent to Miss Williams — Will be forwarded to Mr. P. Greene.

11-22-74  Mr. Z. . . phoned requesting . . . . report — Pt. is alleging . . . . . . . . because of . . . . causing hearing loss."

The specialist to whom Armco referred Claimant reported to Armco on April 2, 1974, advising the employer as follows:

"On January 29, 1974 at my office *I examined* Mr. Herbert Trafton *for Otologic Evaluation as*

*requested.* Mr. Trafton is employed at Armco Steel Corporation as a tow motor operator. He tells me that he has impaired hearing and uses a hearing aid. Years ago he used to have earaches. Examination in the office under the surgical microscope revealed the left tympanic membrane to be intact after removal of a large amount of cerumen from the ear canal. On the right the lower tense part of the eardrum membrane was seen to be intact. A mass of hard debris covered the pars flaccida. It was felt that this was a retraction pocket or a perforation. Some of the hard debris was removed at this time and otobiotic eardrops were prescribed. Mr. Trafton was seen again February 4th for further debridement of this area. On February 11th it could be seen that the right eardrum membrane was intact with a retraction pocket. *The hearing was tested by pure tone audiometry. A bilateral mixed sensorineural and conductive type impairment was found. It amounts to 45% loss with the right ear and 50% loss with the left ear giving a binaural loss of 45%.* It is partially compensated for by means of a hearing aid. With such a loss Mr. Trafton should be able to operate mobile equipment. His loss is not psychological. No specific treatment is indicated. He should wear his hearing aid. A follow-up examination should be made in one years time.

If there is any question about this examination and report please let me know.

(signed)    James J. Gerlach, MD"

(Emphasis added.)

There is no evidence that Armco directed any question to Dr. Gerlach concerning this report.[4]

In short, the evidence showed that Claimant was employed by Armco as a towmotor operator for more than

---

4. The report was placed in evidence by the Claimant.

twenty-five years. Operation of the vehicle itself was shown to produce continuous noise of "iron knocking against iron" during the entire work day. Armco's job classification form for this position contained the notation that performance of its duties subjected the operator to "intense ₒnoise for periods." Annual physical examinations of the Claimant were required by Armco. Such an examination in 1961 showed that "auditory acuity (spoken voice)" was "undiminished." Subsequent such examinations showed otherwise, *i.e.*, 1969, "diminished auditory acuity (spoken voice)"; 1972, "very bad hearing"; 1973, "severe hearing defect"; 1974, company audiogram made and subsequent reference to specialist who reported "binaural loss of 45%." Claimant was in no other noisy environment than that of his employment.

We think the cited testimony and documentary evidence heretofore outlined amply furnished an adequate base upon which the Medical Board might apply its expert knowledge and permit it to arrive at the findings made. *Duncan v. McNitt Coal Co., supra*, at 399 [530]. The Commission plainly was justified in its acceptance of those findings.

### Disability Rating

Armco contends that: ". . . it is patently clear that Mr. Trafton's claim for hearing loss is subject to evaluation and interpretation under Section 25A. It is equally clear that the Medical Board's finding of 45% hearing loss and the Commission's affirmance thereof failed to consider or apply the specific standards of Section 25A."

Article 101, § 25A, in parts here pertinent, reads as follows:

"§ 25A. *Occupational deafness.*

(a) Occupational deafness shall be compensated according to the terms and conditions of this section.

(b) For compensation purposes losses of hearing due to industrial noise shall be confined to the frequencies of 500, 1000, and 2000 cycles per second.

Loss of hearing ability for frequency tones above 2000 cycles per second are not to be considered as constituting disability for hearing.

(c) The percent of hearing loss, for purposes of the determination of compensation claims for occupational deafness, shall be calculated as the average, in decibels, of the thresholds of hearing for the frequencies of 500, 1000, and 2000 cycles per second. Pure tone air conduction audiometric instruments, approved by nationally recognized authorities in this field, shall be used for measuring hearing loss. If the losses of hearing average 15 decibels or less in the three frequencies, such losses of hearing shall not then constitute any compensable hearing disability. If the losses of hearing average 82 decibels or more in the three frequencies, then the same shall constitute and be a total or 100 percent compensable hearing loss.

(d) In measuring hearing impairment, the lowest measured losses in each of the three frequencies shall be added together and divided by three to determine the average decibel loss. For every decibel of loss exceeding 15 decibels an allowance of one and one half (1-$\frac{1}{2}$) percent shall be made up to the maximum of one hundred (100) percent which is reached at 82 decibels.

(e) In determining the binaural percentage of loss, the percentage of impairment in the better ear shall be multiplied by five (5). The resulting figure shall be added to the percentage of impairment in the poorer ear and the sum of the two divided by six (6). The final percentage shall represent the binaural hearing impairment.

(f) Before determining the percentage of hearing impairment, in order to allow for the average amount of hearing loss from nonoccupational causes found in the population at any given age, there shall be deducted from the total average decibel loss, one half ($\frac{1}{2}$) decibel for each year of

the employee's age over forty at the time of last
exposure to industrial noise."

We completely agree with counsel for Armco that
disability ratings of occupational deafness must be
determined under the formulae prescribed by § 25A.

We completely disagree with counsel for Armco that the
findings of the Medical Board and the affirmance of the
Commission failed to consider or apply the specific
standards of that section. We find not a scintilla of evidence
to support the contention. Such a contention was not made
to the Medical Board or to the Commission. It was not until
the appeal to the Superior Court that such a suggestion was
made.

In *Johnstown Coal & Coke Co. v. Dishong,* 198 Md. 467, 84
A. 2d 847 (1951), it was said:

"It is a general rule that in the absence of evidence
to the contrary, administrative officers will be
presumed to have properly performed their duties
and to have acted regularly and in a lawful manner.
All legal intendments are in favor of the
administrative decision, and it will be presumed to
be correct and valid, if all parties have been given a
reasonable opportunity to be heard.

"This general rule is applied when decisions of
the State Industrial Accident Commission are
challenged in the courts. It applies with particular
force in this case, where the Commission based its
decision upon the findings of the Medical Board.
The Legislature has sought to make certain that the
members of the Medical Board are experts on
occupational diseases. The Board is composed of
three physicians appointed by the Governor with
the consent of the Senate from a list of nominees
submitted by the Dean of the Medical School of the
University of Maryland, the Dean of the Medical

School of the Johns Hopkins University, and the Council of the Medical and Chirurgical Faculty of Maryland. By mandate of the Legislature, two of the members of the Board must have at least 5 years of experience in the diagnosis, treatment and care of industrial diseases, and one must be trained in roentgenology and must have at least 5 years of practice and experience." 198 Md. at 474-75, 84 A. 2d at 850-51.

We shall not, in the absence of any evidence whatsoever, assume that the Medical Board in the first instance and the Commission in the second, failed to give full consideration to a provision of the act they have been entrusted to administer.

In Armco's brief it is said:

"An assumption that Section 25A was applied by the Board is conclusively rebutted by the conspicuous absence of any audiogram in the record."

This statement is incorrect. The record contains an audiogram (on a form imprinted "Armco Steel Corporation") dated January 25, 1974. Moreover, Armco records show: (a) that other audiograms had been ordered on May 2, 1973; and (b) that Dr. Gerlach, examining for Armco, in his report specifically pointed out that "The hearing was tested by pure tone audiometry" as required by § 25A (c).

In these circumstances, we deem it appropriate to point out that § 25A (h) reads as follows:

"An employer, otherwise liable under this section, whose employment has contributed to any extent to the employee's occupational deafness shall be liable for the full extent of the deafness of the employee, unless such employer shall establish by competent evidence (including the results of a

professionally controlled hearing test) the extent of the employee's deafness as it existed prior to exposure to harmful noise in the employer's employment."

Perceiving no error, we shall affirm.

*Order affirmed.*
*Costs to be paid by appellant.*