EMPLOYERS MUTUAL LIABILITY INSURANCE COMPANY
ET AL. *v*. ALFRED N. PREMO, INSURANCE COMMIS-
SIONER [WILLIAM R. COTTER, INSUR-
ANCE COMMISSIONER, SUBSTITUTED
DEFENDANT], ET AL.

KING, C. J., MURPHY, ALCORN, COMLEY and SHANNON, Js.

Argued April 8—decided June 1, 1965

*Frank E. Callahan* and *John D. Fassett*, with whom, on the brief, was *David A. Gibson*, for the appellants (plaintiffs).

*Louis Weinstein*, assistant attorney general, with whom, on the brief, was *Harold M. Mulvey*, attorney general, for the appellee (named defendant).

*Joseph P. Cooney*, with whom was *Herbert P. Schoen*, for the appellee (defendant Hartford Accident and Indemnity Company).

KING, C. J. The National Council on Compensation Insurance, hereinafter referred to as the National Council, is a voluntary association of insurance companies licensed, under § 38-190 of the General Statutes, by the insurance commissioner of Connecticut, hereinafter referred to as the commissioner, as a workmen's compensation rating organization. Each member of, or subscriber to, a licensed rating organization may authorize it to file rates on behalf of that member or subscriber, who must then adhere to the rates so filed by that organization. General Statutes §§ 38-188 (b), 38-191. An insurance company may file its own schedule of rates under § 38-188 (a). Under the provisions of subdivision (b) of that section, it need not become, or remain, a member of, or subscriber to, any rating organization. It is claimed by the defendants that as a practical matter a workmen's compensation insurance company is really required to belong to

the appropriate rating organization because it is necessary to have the benefit of the pooled experience of all compensation underwriters in the area, something which is possible only if the company becomes a member of, or subscriber to, the appropriate rating organization. This claim finds support in the fact that every insurance company writing workmen's compensation insurance in Connecticut is a member of, or subscriber to, the National Council, which is the rating organization covering Connecticut. The claim is further supported by the fact that an appeal to the commissioner is expressly granted by § 38-190 (b) from the refusal of an appropriate rating organization to admit a reputable insurance company as a subscriber. Counsel agree that for the purposes of this case no differentiation need be made between members and subscribers, and the term "member" will hereinafter be used as including a subscriber.

A member may propose a change in, or addition to, the filings of the rating organization and, if the proposal is rejected, may appeal to the commissioner under § 38-192 of the General Statutes. Chapter 682 of the General Statutes, which includes §§ 38-186 through 38-201, was largely patterned upon, and taken from, a model act known as the "Casualty and Surety Rate Regulatory Bill", sometimes called the "All-Industry Bill", which was drafted by a committee representing stock and non-stock insurance companies, for adoption by the various states, after the enactment, in 1945, of the McCarran-Ferguson Insurance Regulatory Act. 59 Stat. 33, 15 U.S.C. §§ 1011-15. This federal statute allowed the states an opportunity to take regulatory action after the decision in *United States* v. *South-Eastern Underwriters Assn.*, 322 U.S. 533,

536, 64 S. Ct. 1162, 88 L. Ed. 1440, a case which held that the insurance business constituted commerce and therefore was subject to the federal antitrust statutes. The "All-Industry Bill" was approved by the National Association of Insurance Commissioners on June 12, 1946, and was largely incorporated in chapter 221 of the 1947 Supplement to the General Statutes of Connecticut. As far as it is material to this case, it now forms, with certain amendments, chapter 682 of the General Statutes.

Hartford Accident and Indemnity Company, a stock insurance company, hereinafter referred to as Hartford, proposed to the National Council a "wrap-up" plan for supplying workmen's compensation insurance coverage on an atomic power plant to be constructed at Haddam Neck, Connecticut, by Connecticut Yankee Atomic Power Company, hereinafter referred to as Yankee. Twelve public utility companies comprise the stockholders of Yankee, and no one of them owns more than one-fourth of Yankee's stock. It is a project of great magnitude, having a total estimated construction cost of $84,000,000. The estimated payroll at the job site is over $9,000,000, of which $2,350,000 will be represented by payrolls of subcontractors. The total estimated workmen's compensation premium at current manual rates is $370,000, of which $80,000 will be derived from subcontracted work.

The wrap-up proposal applied only to job-site work. See *Miller Bros. Construction Co.* v. *Maryland Casualty Co.*, 113 Conn. 504, 514, 155 A. 709. Hartford's application was further limited to such contractors and subcontractors as had contracted "ex insurance" with Yankee, that is, had contracted under a provision in the invitations for bids that the contractors and subcontractors would exclude

from their bids the cost of proper workmen's compensation insurance because Yankee itself would provide such insurance at its own expense. Separate policies would be issued to each contractor and subcontractor to which an ex insurance contract had been awarded, just as if each had individually purchased its own compensation insurance. Manual rates, as well as the individual assured's experience rating, which, when applied to the manual rate, gives the "standard premium", would remain unchanged. The only change would be in two adjustments which may be made to the manual rate, if the premium is large enough to qualify, in order to arrive at the actual premium cost to the particular assured. One adjustment would be under the premium discount rules, which provide for an established, sliding scale discount to an assured, based on the size of the premium otherwise computed. The second would be under the retrospective rating plan, which an assured may, at its option, accept at the inception of the policy coverage period and under which its premium, as otherwise determined, is adjusted, either upward or downward, at the expiration of the policy period, to reflect the assured's actual losses during that period. As to these two adjustments, the premiums of all contractors and subcontractors, insofar as these premiums are embraced in the wrap-up proposal, would be combined, instead of being used individually as the basis for computing adjustments for each contractor or subcontractor as would have been the case had each individually obtained its requisite insurance. The net effect is to reduce the total premium cost, at least under the premium discount rules.

Each committee of the National Council, including the committee on rating, is composed of an

equal number of stock insurance company members and of nonstock company members, such as mutual insurance companies. In the present case, there was a tie vote of the six members of the committee on rating which acted on Hartford's proposal. The three stock companies voted in favor of it, and the three mutual companies voted against it. The result, under the rules of the National Council, was that the proposal was lost.[1]

Hartford then appealed to the commissioner under General Statutes § 38-192.[2] The commissioner approved the proposal on September 5, 1963, and ordered the National Council to file it as an addition to its filings, effective September 10, 1963. From that decision, the plaintiffs, some eight nonstock insurance companies, pursuant to General Statutes § 38-201, appealed to the Superior Court.

In the Superior Court the plaintiffs attacked the decision of the commissioner on four main grounds, any one of which, if sustained, would invalidate his decision. Each of these grounds was overruled. At the outset, it is desirable to determine the function and powers of the Superior Court in the hear-

---

[1] Actually, the tie vote occurred in the subcommittee concerned with Connecticut rating, and under the National Council's rules an appeal should have been taken to the National Council's rating committee, but the parties agreed that such an appeal would have been useless since the nonstock companies would have so voted as to have produced a tie. It was therefore agreed that Hartford's action in appealing directly to the commissioner was not improper under the circumstances.

[2] "Sec. 38-192. APPEAL BY MINORITY. Any member of or subscriber to a rating organization may appeal to the commissioner from the action or decision of such rating organization in approving or rejecting any proposed change in or addition to the filings of such rating organization, and the commissioner shall, after a hearing held upon not less than ten days' written notice to the appellant and to such rating organization, issue an order approving the action or decision of such rating organization or directing it

ing and disposition of appeals taken, as was this one, under § 38-201 of the General Statutes. It is therein provided: "(b) Nothing contained in this chapter [General Statutes, c. 682] shall require the observance at any hearing [by the commissioner] of formal rules of pleading or evidence. (c) Any order or decision of the commissioner shall be subject to [judicial] review [at the instance of any party interested], on the basis of the record of the proceedings before the commissioner and such review shall not be limited to questions of law . . . . The court may, in disposing of the issue before it, modify, affirm or reverse the order or decision of the commissioner in whole or in part." Clearly, the appeal is not a de novo hearing in which the court takes evidence. Nor does the court substitute its judgment for that of the commissioner. Rather, the court determines, on the basis of the record before the commissioner, whether the appellants, herein referred to as the plaintiffs, have sustained the burden of proving that the action of the commissioner was illegal, that is, either contrary to some

to give further consideration to such proposal or, if such appeal is from the action or decision of the rating organization in rejecting a proposed addition to its filings, he may, if he finds that such action or decision was unreasonable, issue an order directing the rating organization to make an addition to its filings, on behalf of its members and subscribers, in a manner consistent with his findings, within a reasonable time after the issuance of such order. If such appeal is based upon the failure of the rating organization to make a filing on behalf of such member or subscriber which is based on a system of expense provisions which differs, in accordance with the right granted in subdivision (2) of subsection (a) of section 38-187, from the system of expense provisions included in a filing made by the rating organization, the commissioner shall, if he grants the appeal, order the rating organization to make the requested filing for use by the appellant. In deciding such appeal the commissioner shall apply the standards set forth in section 38-187."

statute or controlling rule of law or so arbitrary and unreasonable as to amount to an abuse of his discretion. *Jaffe* v. *State Department of Health,* 135 Conn. 339, 353, 64 A.2d 330; *Gibson* v. *Connecticut Medical Examining Board,* 141 Conn. 218, 222, 104 A.2d 890.

The plaintiffs correctly agree that, in addition to considering the transcript of the hearing before him and the briefs filed with him, the commissioner had the right to consider records in his department and to call upon his background of expert knowledge.

The right of appeal to the commissioner under General Statutes § 38-192 is restricted to an appeal "from the action or decision of . . . [the] rating organization in approving or rejecting any proposed change in or addition to the filings of . . . [the] rating organization." It should be noted that the commissioner ordered the wrap-up added to National Council's filings "on behalf of its members and subscribers." It was not a filing for the use of Hartford only. It was open to any member or subscriber who, during the life of Yankee's construction project, might succeed in obtaining the insurance on the project in place of Hartford. In other words, although the filing was restricted to the specific Yankee project, it was not restricted to any particular insurance company.

The plaintiffs claim, inter alia, that the approval of the wrap-up provision on the single project of the construction of the nuclear atomic power plant at Haddam Neck, Connecticut, is illegal.

Ordinarily, a filing in "The Basic Manual of Rules, Classifications and Rates for Workmen's Compensation and Employers' Liability Insurance," hereinafter referred to as the Basic Manual, would

be of such a character that it is descriptive of, and can be applied to, a given type of risk, as distinguished from being in terms made applicable to a specific, named risk. This seems obvious from the provisions relating to rates and other filings found in General Statutes §§ 38-187 (especially as amended by Public Acts 1963, No. 347, § 2, effective May 29, 1963, by the addition of subdivision [5] to subsection [a]), 38-188 and 38-191, considered as a whole, as well as from the provisions of § 38-192 previously quoted in the footnote.

The reason, and as far as appears the only reason, why Hartford could not put its proposal into effect under existing filings, and without applying to the rating organization, was because of the effect of the "entity rule", hereinafter explained, on the two adjustments previously mentioned. Under the rules of the rating organization, it is provided in the Basic Manual (p. R15a) that the term "assured" shall mean either "[a] single legal entity" or "two or more legal entities which are eligible for combination under the Rules of Experience Rating Plan of the National Council on Compensation Insurance", which is a separate manual. The Experience Rating Plan manual provides that "[t]wo or more entities shall not be combined for rating purposes" except that "combination shall be made as respects entities in each of which the same person, or group of persons, or corporation owns a majority interest", which, in the case of a stock corporation, is defined as "a majority of the issued voting stock." These provisions constitute the so-called entity rule.

There is no claim of any ownership by Yankee of an interest, either in the form of voting stock or otherwise, in the numerous independently owned contractors and subcontractors combined in the

wrap-up proposal and covered by ex insurance contracts. Thus, these contractors and subcontractors could not be "combined for rating purposes" by Yankee under the existing entity rule. It was for that reason that Hartford proposed, and the commissioner after hearing approved, an "addition to" the filings of the rating organization expressly authorizing Hartford's proposal as applied to this specific Yankee project only. The commissioner held that the wrap-up was an addition to a filing and that it complied with the requirements of General Statutes § 38-187, and he directed the National Council to file, on behalf of its members and subscribers, "an addition to its filings to permit, for this [Yankee] project only, the combining of the operations of the owner, the principal contractor and all contractors and sub-contractors operating on ex-insurance contract for the purpose of retrospective rating and the application of premium discounts."

The plaintiffs point out that the power of the commissioner, under General Statutes § 38-192, to approve the filing and to order the National Council to add it to its filings was conditioned, inter alia, on his applying "the standards set forth in Section 38-187." Subdivision (4) of subsection (a) of § 38-187 provides that "rates shall not be excessive, inadequate or unfairly discriminatory." The commissioner found in this case, and gave as his reasons for approval, that the wrap-up did conform to the provisions of § 38-187, that the project and the amount of the manual premium were of "a size not ordinarily encountered in the State", that "[t]he very magnitude of such a project makes possible controls beyond the realm of the usual risk and invites consideration of rating procedures not gener-

ally appropriate", and that "the general contractor of a large project can exercise decisive control over safety engineering, loss prevention, claim handling and medical care."

If we accept the commissioner's findings and conclusions of fact as correct, there is nothing in the record to explain why they would not equally apply to other large construction projects, even though not as large as Yankee, if those projects were operated on an ex insurance basis. Indeed, on February 3, 1959, the commissioner approved a wrap-up filing for the Constitution Plaza development and again on July 16, 1963, for the Hartford National Bank and Trust Company office building, both in Hartford. While the size of these projects, either in construction cost or in manual premium cost, does not appear, there is no claim that each was of the approximate magnitude of Yankee. The commissioner's expressed reasons for approval leave to speculation how large a project should be in order to come within the eligibility criteria upon which the commissioner based his approval in Yankee's case. There is nothing in the record to indicate how many other large projects there may have been which would have similarly qualified under wrap-up procedure, if the eligibility criteria set forth by the commissioner in this case had been applied. Nor is there anything to indicate how many other similar large projects may be undertaken in the relatively near future which would also qualify under the same criteria. That an appreciable number of large construction projects are in contemplation and in actual progress is a matter of common knowledge. On this record, the approval of the wrap-up filing, limited to this specific Yankee project, seems clearly discriminatory and unfairly so.

Furthermore, an ex insurance wrap-up plan would not be available on any construction project, however large or whatever its characteristics, unless some member of the National Council happened to apply for an addition to the filings which would cover that particular project, and, if that filing was rejected, thereafter successfully carried the matter through to the commissioner,[3] as Hartford has done here. Whether such action would be taken is left wholly to chance, and unless taken the wrap-up procedure could not be utilized. Yet such a project might well possess all the characteristics which the commissioner found entitled the two other wrap-up proposals, and that of Yankee, to his approval. This also seems necessarily to result in unfair discrimination.

If a wrap-up filing were made generally applicable to any risk of a size and type such that the commissioner would find that the characteristics and eligibility criteria obtaining in Yankee were present in a degree justifying his approval under the same theory which induced his approval of the two other projects and of Yankee, then unfair discrimination would be avoided, at least in the respects now apparent on this record. Indeed, a reasonable classification procedure in a situation such as this one seems to be contemplated, if not actually required, by the 1963 amendment adding subdivision (5) to subsection (a) of § 38-187. Public Acts 1963, No. 347, § 2.

It seems clear that if the wrap-up filing is a sound and valid one as applied to certain large ex insurance construction projects, as the commissioner

---

[3] Actually, the insurance commissioner who approved the Yankee and the two other wrap-ups has been succeeded by another, who has been substituted as a party defendant.

necessarily held in the case of the three wrap-ups already approved, then in order to avoid unfair discrimination the filing should be in general form and made applicable to all projects possessing the same eligibility criteria. Something along these lines was proposed in 1957. It is immaterial to this decision that the 1957 proposal was blocked by the nonstock votes in the National Council and was never brought by appeal before the commissioner under General Statutes § 38-192. If such a wrap-up procedure is sound and valid, it is unlikely that the nonstock insurance companies could long deprive the public of its benefits, even if we were to assume that they would attempt so to do.

The defendants claim that there is nothing illegal about an individual rate for a specific risk, and they point to the provision in the Basic Manual (p. R2b) that "3. [e]very risk described by a classification which carries the symbol 'a' on the State Rate Sheet shall be specifically rated by the Board or Bureau having jurisdiction" and to the provision on page 1 of the Connecticut rate sheets in the same Basic Manual to the effect that the significance of the symbol "a" is that the "[r]ate for each individual risk must be obtained by Home Office from Board or Bureau having jurisdiction." While the record is inadequate for a determination of the full significance of these provisions, we do not construe them to mean that the premium cost of the individual risk referred to by the symbol in question is set at whatever the board or bureau feels the traffic will bear at the moment, nor that the premium cost varies from day to day or between individual risks with substantially identical characteristics at the whim or caprice of the board or bureau. See *Liberty Mutual Ins. Co.* v. *Larson,* 169 So. 2d 866, 872 (Fla.).

Before we could accept any such construction, we should at least have to have a clear explanation in the record in justification of it, especially in the light of General Statutes § 38-187 (a) (4) and (5).

The defendants also point out that General Statutes § 38-187 provides that uniformity among insurers as to matters covered by that section, entitled "Making of Rates", is neither required nor prohibited except that the rates shall not be "excessive, inadequate or unfairly discriminatory." For the reasons pointed out, on this record the wrap-up proposal for Yankee and Yankee alone clearly seems to be not only discriminatory but unfairly so.

We do not hold generally that a special rate for a particular risk, especially if of a unique character, is per se illegal. We determine only the discriminatory character of the commissioner's approval of the Yankee wrap-up on this record, considering the tests on which the commissioner based that approval and in the light of his approval of the two previous wrap-ups. Even though the approval of the commissioner was otherwise warranted under the criteria which he applied, his approval of this single specific project was not authorized in the face of the obvious intent of chapter 682 of the General Statutes as a whole that rates and premium charges shall not be unfairly discriminatory. This determination is dispositive of this appeal adversely to the defendants.

There is error, the judgment is set aside and the case is remanded with direction to sustain the appeal.

In this opinion the other judges concurred.