## STATE INSURANCE COMMISSIONER OF MARYLAND *v.* THE BALTIMORE LIFE INSURANCE COMPANY

[No. 625, September Term, 1966.]

122

*Decided December 5, 1967.*

*Motion for rehearing filed on December 29, 1967; denied on January 4, 1968.*

The cause was argued before HAMMOND, C. J., and HORNEY, MARBURY, BARNES and McWILLIAMS, JJ.

*Lewis A. Noonberg, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellant.

*Robert C. Prem,* with whom were *A. Adgate Duer* and *Niles, Barton, Gans & Markell* on the brief, for appellee.

HAMMOND, C. J., delivered the opinion of the Court. BARNES, J., dissents. Dissenting opinion at page 135, *infra*.

As of December 31, 1965, the Baltimore Life Insurance Company (Baltimore) showed in its statement of condition a "loss or claim reserve" of $530,246.89 to cover unclaimed debts it owed the holders of matured endowment policies. Its surplus account included $665,190 of such unclaimed debts.

After a hearing, Insurance Commissioner Burch on August 23, 1966, ordered Baltimore to restate its accounts to show the $665,190 as a liability rather than a part of surplus and to continue in the future to establish and maintain as a liability the total amounts of such unpaid matured endowments. The company appealed to the Baltimore City Court under Code (1964 Repl. Vol.), Art. 48A, § 40, and Chief Judge Foster held that the Commissioner did not have the authority to pass the order appealed from, and reversed. The Commissioner appealed to this Court.

Baltimore issues both industrial and ordinary twenty and thirty-year endowments, and endowments payable at a specified age. Policyholders often stop paying premiums after a few years. If, in such case, the policyholder does not elect to take the cash value of the policy it becomes a non-premium-paying contract, and by its express terms will provide extended coverage to the extent the premiums theretofore paid allow. If enough premiums had been paid, the policy not only will provide both coverage to its endowment maturity date but also an additional sum which is due the policyholder if he is alive at the maturity date. (If he dies during the period of extended insurance coverage, his named beneficiary receives the specified death benefit, and the company's liability under the policy ceases.) The additional amount is increased by interest earned and credited thereon, and, as so increased, becomes the "maturity value" which the policy promises to pay the holder of the policy in cash at the end of the endowment period. The average amount so payable is about $30.00 although it may be as small as $3.00 and as great as $500.

Baltimore has been in business since 1882 and apparently has issued endowment policies from its early days. Its procedure in

the matter of matured endowments has been consistent. When an endowment policy matures, the agent on the debit route is told to make an effort to find the policyholder or his heirs. Often neither a policyholder nor a successor in interest can be found and this has given rise to the current controversy over how the amounts due under matured but unclaimed endowments are to be treated. In states in which the company operates that have escheat laws, Baltimore sets up as a liability the full amounts of unclaimed matured endowments owed policyholders living in such states until the amounts owed them escheat to the state. The amounts thus due policyholders in states not having escheat laws—Maryland was such a state until June 1, 1966, the effective date of the Uniform Disposition of Unclaimed Property Act, now codified as Art. 95C of the Code—are in small part held as claim reserves and in larger part are at each year's end transferred to surplus.

Baltimore thus takes as its own the part not held as a reserve liability under what in effect is a private escheat practice. The mechanics are these: Baltimore has constructed "continuance tables," based on its actual experience over the years, which reflect the number of demands for payment of amounts due on matured endowment policies likely to be made from year to year in relation to the total amounts due under such policies from year to year. In a letter to the Commissioner, Baltimore's president explained its practice in this way:

> "In constructing such continuance tables it is customary to introduce a safety margin for possible differences between the observed experience and the experience to be encountered in the future. In lieu of such a margin, the Company has found that the amount of the current year's maturities exceeds the amount determined by the application of the continuance table, and has carried the former amount as a liability in its statement. Thus, in 1961, the current year's maturities amounted to $64,811 and the continuance table liability to only $49,001. In 1965 the current year's maturities amounted to $44,805 and the continuance table liability to only $39,249."

As of December 31, 1965, Baltimore maintained a "loss or claim reserve" for matured endowments owed of $530,246.89. The Commissioner found that as of that date there was in Baltimore's surplus a total of $665,190 of debts owed by it to holders of matured endowment policies. The company does not challenge the figures.

In November of 1963 the then Commissioner, after examination of Baltimore by his agents, noted in his Report on Examination of the company as of December 31, 1961, that:

"In reporting its claim liabilities, the Company excluded amounts due on matured non-premium paying endowments in those states which do not have escheat laws, except for amounts maturing during the current year.

"Under date of January 18, 1963, the Attorney General of Maryland ruled these endowments were a 'continuing liability,' and consequently, the sum of $530,-544.00 representing endowments matured prior to 1961 and unpaid at December 31, 1961, have been included among the liabilities in this report."

Baltimore neither requested a hearing nor challenged the Commissioner's report, and continued its practice. On February 8, 1966, Commissioner Burch wrote Baltimore calling its attention to the directive in the 1963 Report on Examination and to the fact that Baltimore's annual statements for 1963 and 1964 indicated that the company had made no provision for full potential liability to holders of matured endowments. The letter asked Baltimore to explain its failure in 1963 and 1964 to make the suggested change. Baltimore replied by a letter from its president (from which we quoted earlier) in which it took the position that it was required only to set up as much of a reserve as its experience indicated would be necessary to satisfy its obligation to non-premium-paying matured endowment holders. A conference between the company's president and the Commissioner followed, and the president then wrote the Commissioner that Baltimore declined to follow "the suggestions contained in your letter." The Commissioner replied that his letter was not intended as a "suggestion" but was a "directive"

to Baltimore to set up the liability on its books. A hearing before the Commissioner followed, at which the only witnesses were a vice-president-actuary and a vice-president-secretary of Baltimore. They testified as to the long-continued practice and asserted their opinions that it was actuarily and legally sound in theory and worked in practice—that is, the reserve Baltimore maintains has always been more than sufficient to pay the demands actually made for sums due holders of matured endowments, and that if the practice were not followed, earnings, surplus, and dividends to policyholders would be impaired.

On November 19, 1962, Commissioner Sears had written the Attorney General in regard to the controversial accounting practice of Baltimore, stating that in cases of policyholders in states which have escheat laws it carries full reserves until it remits to the state, and in Maryland and other states which do not have escheat laws "it takes down the reserve one year after the endowment matures," and asking the question whether the "company's liability under its contract is void after a one year period, and if it is proper for such reserves to be taken down and thereby automatically transferred to surplus?"

The Attorney General replied under date of January 18, 1963, that he had reviewed three specimen policies of Baltimore and Art. 48A of the Code and that both questions should be answered in the negative because there was no policy provision that relieved the company from liability one year after maturity of the policy and no provision in the law "such as the escheat laws, which are common in * * * other states." The Attorney General said: "We construe each of these policy forms to impose a continuing liability on the company."

After the hearing before him, Commissioner Burch ruled that:

> "In addition to the Opinion of the Attorney General of January 18, 1963, I hold that the provisions of Section 77 of the Insurance Code [Art. 48A] clearly require the action ordered by the Department. Section 77, in setting forth the liabilities required to be carried on the books of the company, states as follows:
> '77. Liabilities
> In any determination of the financial condition of

an insurer, capital stock and liabilities to be charged against its assets shall include:

(2) The amount, estimated consistent with the provisions of this article, necessary to pay all of its unpaid losses and claims incurred on or prior to the date of statement, whether reported or unreported, together with the expenses of adjustment or settlement thereof;'

"In arriving at my decision I also rely on the testimony of the company's own witness and actuary, Mr. Ralph E. Edwards, who quite candidly admitted that he knew of no other company using the technique proposed by Baltimore Life. When specifically asked whether the method used by the company had ever appeared in any treatise or textbook dealing with matured endowments the witness could only say 'that the technique is so general that I do not believe that it's ever been written up in reference specially to matured endowments.' "

At the appeal before Judge Foster the same two witnesses. who had been before the Commissioner repeated in essence their prior testimony. In addition, there was introduced through the manager of Baltimore's actuary department the results of a survey made by means of a questionnaire which he had sent to fifty-nine mutual life insurance companies in the United States. with assets of $25,000,000 or more. The answers showed that forty-five carry a reserve for matured endowment policies and all forty-five carry this liability for a specific number of years. for the full amount owed. Twenty-seven of the forty-five carry the reserves indefinitely where an escheat law is not in effect. The witness admitted that if Baltimore had answered the questionnaire it would have been the only company to answer the question as to whether the liability is carried a specific number of years, "no." He said: Our approach is unique in that we seem to be the only company following it." The other officers. agreed that Baltimore was a lone wolf in this regard.

Baltimore also offered before Judge Foster a consulting actuary and an actuary associated with a national accounting firm..

Both were of the opinion that the practice was actuarily sound in that a recognized actuarial technique was applied to accurate arithmetic. Neither knew of any life insurance company that used the technique and neither knew of anything in insurance or accounting literature that approved it, or indeed referred to it. The accountant-actuary said: "This is not generally an actuarial item" and that if he were giving a certification "I would indicate that among the actuarial items is this liability * * * in this case I would show a separate item in certification because something new has come within the actuarial purview, so to speak * * *. I would have a separate write up of this method."

There appeared in support of the Commissioner's order an examiner and an actuary, both in the State Insurance Department, and a consulting actuary of long and broad experience. They all believed it unsound to apply actuarial techniques to absolute debts and had never known it to be done. The department's actuary testified that a life insurance company must be most conservative in establishing its liabilities because the contracts it issues run for such long periods of time. The procedure used by Baltimore may enable a life company to show that it has more than the minimum surplus required by law although actually the part of the total surplus that carries it above the minimum may really represent absolute debts that would have to be paid on demand, including the demand of the state if an escheat law is passed, or if, in some way, large numbers of policyholders, or their heirs, suddenly became aware of their rights to be paid. In either case capital funds might be impaired, or reduced below the point of solvency.[1] Since no other life insurance company uses Baltimore's technique, "surplus" would mean one thing for all companies except Baltimore and a different thing for Baltimore. By transferring funds to surplus, a life company could use debt obligation money to pay expenses for expansion and to pay dividends. The transfer of

---

1. In Baltimore's case there would be no such danger since its surplus is over $6,000,000 and the statutory legal minimum surplus for a life company is $200,000, under Code (1964 Repl. Vol.), Art. 48A, § 49.

debt obligation money to surplus without identifying it as such could well mislead purchasers of insurance as to the real financial strength of the company so doing.

The consulting actuary who supported the Commissioner's position and order referred to a standard text. *Life Insurance Statements and Accounts* written by E. C. Wightman, published in 1952 (and reprinted in 1962) by the Life Office Management Association, in which he quoted the author as stating on page 218 that funds due absolutely by a life company—he spoke there of surrender values on cancelled policies—must be set up in full as a liability, and as saying:

> "In all cases such as those cited the company must include the amount due in that reported on line 11.1 in its liabilities statement either until the statute of limitations has presumably effectively tolled against the insured or until the amount due has been paid into the state treasury in accordance with a statutory provision therefor."

The testimony before the Commissioner and before the court established that Baltimore concedes its obligations under matured endowments to be debts to the respective policyholders and to be absolute and continuing obligations, as the Attorney General held. Baltimore says that, no matter how long after maturity of his policy the holder or the personal representative of a deceased holder of a matured endowment demands his money, he would be paid it, citing as an example a case of a $9.00 matured endowment which became due in 1915 and long ago went to surplus and saying it would be paid if the proper person made demand.[2] Those making demands heretofore al-

---

2. Baltimore's president wrote in his letter to the Commissioner: "A matured endowment, however, is no longer an in-force policy, but a financial obligation with respect to the proper claimant." It has been held judicially that the president is correct in his analysis. In Anderberg v. Metropolitan Life Ins. Co., 58 N. Y. S. 2d 120, 121, appeal denied 59 N. Y. S. 2d 627, the Court held:

> "When the policy matured as an endowment, the life insurance risk terminated and the interest of the beneficiary was extinguished. All that remained was an obligation

ways have been paid from the reserve maintained for that purpose but if the reserve were insufficient the creditor would be paid from surplus. Baltimore agrees that no provision of the policies involved—the contracts between it and its insureds—authorizes it to transfer to surplus money due the policyholder. It agrees that in states which have escheat laws it must and does carry the full amount due as liability until it pays the policyholder or the state, and that this must and will be its practice in Maryland as to non-premium-paying endowment policies maturing after June 1, 1966, the effective date of the Uniform Disposition of Property Act. Its premiums are the same in states having escheat laws and in those which do not.

On this record Judge Foster in an oral opinion delivered at the conclusion of the hearing found that paragraph 2 of § 77 of Art. 48A of the Code, which the Commissioner had quoted in his opinion (providing that "in any determination of the financial condition of an insurer * * * liabilities to be charged against its assets shall include * * * (2) the amount, estimated consistent with the provisions of this article, necessary to pay all of its unpaid losses and claims * * *") controlled casualty insurance companies and not life insurance companies, particularly since paragraph 3 of § 77 deals specifically with life and disability insurance and annuities. He found further that if he were mistaken in his reading of the statute, "the language * * * 'necessary to pay' means not an amount equal to unpaid losses and claims, but an amount which the company might be called upon to pay at some future time under reasonably foreseeable circumstances and conditions." Judge Foster, saying that his remarks were gratuitous, commented that he found the opinions of the witnesses for Baltimore offered "an adequate basis * * * to support my conclusion," and added that if the testimony of the experts who supported the Commissioner's view in court had been before the Commissioner, perhaps he "could equally well have based his conclusions on their testimony * * *."

---

* * * to pay $2,000 in accordance with the endowment provisions. The policy was then merely evidence of a debt due and owing the insured and was no longer in force as a policy of insurance." (Citation omitted.)

When Judge Foster's attention was directed to paragraph 5 of § 77, which provides that among the liabilities to be charged against the assets of an insurer are "taxes, expenses and other obligations due or accrued at the date of the statement," he held that paragraph 5 was not applicable because it "was not a basis for the Commissioner's decision."

We think Judge Foster reached the wrong conclusion and that the order the Commissioner passed was authorized by Art. 48A of the Code and justified by the record before him and before the court. (The testimony in the latter could have been made available to him if the court ordered a remand as § 40 (5) permits. Cf. *Nuger v. Insurance Comm'r,* 238 Md. 55.)

In determining the propriety of the Commissioner's order the apposite parts of Art. 48A, as parts of a general legislative system governing the subject matter, must be read and considered together. *Md. Medical Service v. Carver,* 238 Md. 466, 478. In the discussion of the statute law, all references will be to sections of Art. 48A unless otherwise noted. Section 3 defines "insurer" as including "every person engaged as indemnitor, surety, or contractor in the business of entering into contracts of insurance." Section 24 (1) directs the Commissioner to "enforce the provisions of this article, and * * * execute the duties imposed upon him by this article." Paragraph 2 of § 24 gives the Commissioner "the powers and authority expressly conferred upon him by or reasonably implied from the provisions of this article." Paragraph 3 provides that the Commissioner "may conduct such examinations and investigations of insurance matters * * * as may be necessary to fulfill the purposes of this article." Section 26 gives the Commissioner power to make reasonable rules and regulations. Section 29 provides that every order of the Commissioner is to be in writing and signed and shall state its intent and purpose and the grounds on which it is based. Paragraph (2) (iii) of § 29 provides that the order shall also contain "the provisions of this article pursuant to which action is so taken or proposed to be taken;" and then adds that "failure to so designate a particular provision shall not deprive the Commissioner of the right to rely thereon." Section 34 requires the Commissioner or his examiner to make a full and true report of each examination, makes the report ad-

132

missible in evidence against the person examined and reported on, and gives that person the right to a hearing with respect to the report. Section 35 provides for hearings, § 38 establishes hearing procedures, and § 40 provides for appeals and procedures on appeal. Section 48 requires a minimum capital of $200,000 for a life insurer and § 49 a minimum surplus of $200,000. Section 58 requires each insurer to file with the Commissioner each year "a true statement of its financial condition, transactions, and affairs as of the December thirty-first preceding; said statement to be in such form and content as is approved or adopted for current use by the National Association of Insurance Commissioners * * * for use as to the type of insurer and kinds of insurance to be reported upon, and as supplemented for additional information required by the Commissioner." The National Association has provided the form contemplated by § 58, known as the Convention Blank. This form which Baltimore duly filed for 1965 requires the full disclosure of the amount of all matured endowments due and unpaid and requires that this total amount be shown as a liability. Liabilities are required to be revealed and explained by various specified detailed exhibits. Exhibit 11—"Policy and Contract Claims for Other than Accident and Health Policies—Part 1—Liability— End of Current Year," in the first column opposite line 1, titled "Due and Unpaid," calls for the total claims unqualifiedly payable. (The official instructions say under Exhibit 11, Part 1 —"Line 1—Due and unpaid—Include only claims which are complete except for the payment of the amount due.") When Mr. Wightman says at page 282 of his text on insurance company accounting referred to above, which was in evidence before the court, that in all cases of funds due unqualifiedly "* * * the company must include the amount due in that reported on line 11.1 in its liabilities statement * * *," he refers to Convention Blank Exhibit 11, Part 1, line 1.

Columns 2 and 3 of line 1 break down the total in Column 1 into industrial and ordinary life insurance. There is a footnote at the bottom of columns 2 and 3 which reads "including matured endowments unpaid amounting to ........." In its 1965 report on the mandatory Convention Blank, Baltimore put on line 1 of Part 1 of Exhibit 11 in the first column opposite "Due

and unpaid" the figure $571,181.61. In column 2 under "Industrial Life" it put $530,246.89. Opposite the footnote under column 2 "including matured endowments unpaid amounting to" it put the same figure—$530,246.89. In column 3 "Ordinary Life" the line figure was $40,934.72 and the footnote figure the same. Line 4.1 of the liability side of the insurer's financial statement (p. 3 of the Convention Blank) calls for the insertion of the amount of "Policy and contract claims—Life [as shown in] (Exhibit 11, Part 1)." It seems evident from the record that Baltimore's obligation on December 31, 1965, on "matured endowments unpaid" was not a reported total of $571,-181.61 for both industrial and ordinary policies but, rather, in addition the $665,190 which was in the surplus account, which it admits it still owes and must and would pay on demand of one entitled to payment.

Turning again to the provisions of Art. 48A, § 77, as we have seen, requires each insurer to have charged against its assets "(2) the amount * * * necessary to pay all unpaid losses and claims * * *" and "(5) taxes, expenses and other obligations due or accrued at the date of the statement." Section 252 requires all mutual insurers doing business on a non-assessable basis (Baltimore is and does) to have "unencumbered assets over and above all required reserves and other liabilities in an amount at least equal to that required under * * * Sections 48 and 49 * * *."

As we read Art. 48A it is the duty of the Commissioner to see that an insurer keeps its accounts and files its reports as §§ 58 and 77 require. Section 58 and the Convention Blank call for a revelation of all that is due and unpaid on matured endowments, not the insurer's estimate of the percentage of the total amount due and unpaid it may actually be called on to disburse.

Paragraphs 2 and 5 of § 77 in terms apply to each insurer and the word "insurer," as defined and made applicable to the provisions of Art. 48A by § 3, generally includes life insurers.[3]

---

**3.** Both the president of Baltimore in his letter to the Commissioner and the vice-president-actuary in his testimony showed that they regarded or treated § 77 (2) as applicable to Baltimore as a life insurer.

Further, the words "unpaid losses and claims" are not words of art applicable only to casualty insurers. They are used by life as well as casualty insurers, as Baltimore's annual statement shows.

We do not read the words "the amount estimated consistent with the provisions of this article, necessary to pay all of its unpaid losses and claims * * *," in § 77 (2) to mean, in the case of fixed absolute liabilities, a sum less than the known total. The "estimate" which the company must make is to be "consistent with the provisions of this article." The "provisions of this article" under § 58 and the Convention Blank (which was in use long before the enactment of § 77 by Ch. 553 of the Laws of 1963) call for a report and accounting of the full amount due and unpaid on absolute obligations, not a part. The fact that Baltimore's application of the actuarial technique to a known and fixed absolute obligation is unique in the insurance world militates against a conclusion that the Legislature intended to permit its use in estimating liabilities and against a conclusion that its use would be consistent with the provisions of Art. 48A. Further, Sec. 77 (5) lists "other obligations" as liabilities, and Baltimore's endowment policy debts are obligations.

The purposes of Art. 48A, as we see them revealed by the terms of the statute, require each insurer to reveal annually in a specified uniform fashion a detailed account of its insurance activities, its gains and losses, and its assets and its liabilities so that the regulatory authorities, the public and those dealing with the insurer, including existing and prospective policyholders, can see its actual financial worth and soundness and whether it meets statutory requirements. To insure that these purposes will be fulfilled, the statute requires that all absolute liabilities, not excepting all sums due and payable on matured and unpaid endowment policies, be revealed and explained as liabilities. The Commissioner was authorized to require Baltimore to conform. He was also justified by the evidence in rejecting Baltimore's claim that its system of accounting and its practice did conform. The undisputed fact was that the amounts due holders of matured endowments were debts which the company continued to owe absolutely for an indefinite period. Those which were transferred to surplus were still absolute obligations which would have to be and admittedly would be paid on demand.

The debts were in effect demand promissory notes, not subject to limitations, and analogous to the debts due a depositor by a bank. The Commissioner's reasoning mind well could have reasonably concluded that it was just as inappropriate, improper and misleading for a life insurer to take down to surplus absolute and continuing obligations due policyholders as it would be for a bank, on the theory that a certain estimated percentage of its deposits would never be demanded by depositors, to transfer that percentage of its total deposits to surplus or undivided profits. He reasoningly could have concluded reasonably that because an insurer properly and necessarily uses the actuarial approach of estimating probabilities from past experiences, as far as the risks it insures against and the payments of claims related to those risks go, it does not follow that it is appropriate and proper for an insurer to use the same technique in regard to absolute debts it owes. He could properly have decided it would not be right to have one rule for Baltimore and another for all other insurers, and that to permit others to follow Baltimore's practice would be to risk the danger that debt obligations masking as surplus might show that an insurer was meeting the minimum requirements of the law when it was not or that it was solvent when it was not.

The Commissioner's order should have been affirmed.

*Order of the Baltimore City Court*
*appealed from reversed, with costs.*

BARNES, J., dissenting:

I dissent because in my opinion Chief Judge Foster correctly construed the applicable statutory provisions and found that these provisions and the testimony did not justify the passage of the order by the Commissioner involved in this case.

The applicable statutory provisions have been fully set out in the majority opinion and need not be repeated. Statutory references will be to Code Article 48A unless otherwise noted.

Assuming, *arguendo,* that section 77, subparagraph (2) is applicable to a life insurance company such as Baltimore Life, the *language* of that subparagraph only requires the company to charge against its assets for a determination of its financial con-

dition the "amount, *estimated* consistent with the provisions of this article, *necessary to pay* all of its unpaid losses and claims * * *." (Emphasis supplied). If the General Assembly had intended that the *full amount* of *unpaid claims* be charged against the Company's assets in the financial statement, it would no doubt have said this. If this has been the intention, the legislature would not likely have used the word "estimated" or the words "necessary to pay." I can only conclude that the language of subparagraph (2) means what the words ordinarily and usually mean and that they express, clearly and without ambiguity, what the General Assembly intended. There is, therefore, nothing to construe. Our duty is then to give effect to the legislative intent as stated in the statute. As we stated in *Maryland Medical Service, Inc. v. Carver,* 238 Md. 466, 478, 209 A. 2d 582, 588 (1965):

> "The legislative intent is to be sought in the first instance in the words used in the statute and if there is no ambiguity or obscurity in the language used in the statute, there is usually no need to look elsewhere to ascertain the intent of the legislature."

As the majority opinion points out, all the parties concede that the liability reserve for non-premium paying matured endowments established by Baltimore Life has been estimated by the Company under a realistic formula and that this reserve was at the time of the proceeding and had been for many years in an amount quite sufficient to pay all of such unpaid claims which would be presented to the Company for payment. The actuarial principle involved is a well established one and was properly applied to the factual situation. Nor is there the slightest question about the Company's solvency, nor was there any evidence that the continuation of the Company's accounting practice would in any way impair that solvency. Indeed, if and when such possible impairment might be indicated, the Commissioner has full power under section 82, subparagraph (2) to require the Company "to maintain a loss reserve in such increased amount as is needed to make them adequate." The Commissioner did not purport to proceed in this case under section 82, subparagraph (2) for the obvious reason, no doubt, that the

company's reserve is undoubtedly sufficient based on its experience. I conclude that the long continued practice of Baltimore Life in regard to its reserve was not in conflict with the provisions of subparagraph (2), if these provisions are applicable to life insurance companies.

I have grave doubts that the provisions of subparagraph (2) were intended to apply to life insurance companies at all, but, rather, were intended to apply to casualty companies. Subparagraph (3) of section 77 indicates this. Subparagraph (3) begins with the words "With reference to life and disability insurance and annuity contracts," and then sets forth four provisions applicable to companies of the types mentioned. This indicates to me that the provisions of subparagraph (2) were not intended to apply to life insurance contracts, but that these contracts were to be governed by subparagraph (3). Here again this is what the language indicates and this language shows the legislative intent. There appears to be no question that the four requirements in subparagraph (3) do not conflict with the accounting practice of Baltimore Life in regard to the reserve in question.

Nor does subparagraph (5) of section 77 in my opinion conflict with the Baltimore Life accounting practice. This subparagraph requires an insurer to charge against its assets "Taxes, expenses and other obligations due or accrued at the date of the statement." Obviously the reserve is not for "taxes" or "expenses," and in my opinion, it cannot be within the language "and other obligations." Applying the maxim of construction, *ejusdem generis,* (see *Smith v. Higinbothom,* 187 Md. 115, 48 A. 2d 754 (1946)), the general language would mean "other obligations" *like* taxes and expenses. Subparagraph (5) was intended to apply to definite amounts *inevitably payable* to definitely ascertained specific persons.

In my opinion, Baltimore Life properly filled in the form in use by the National Association of Insurance Commissioners referred to in the majority opinion. It is clear to me that Exhibit 11 in that form includes estimated or actuarially computed figures. For example, in line 3 of Part 1 of Exhibit 11 there is an item for "Incurred but unreported (less reinsurance ceded)." This, of necessity, is an estimated or actuarially computed fig-

ure. Line 6 in Part 1, to which the footnote mentioned in the majority opinion refers, is designated "Net Liability." The footnote reads "Including matured endowments amounting to . . . . . * * *." Baltimore Life inserted on this blank the amount of the reserve for liability for the claims calculated on the actuarial basis already mentioned. As I see it, this was justified as the word "amounting" refers to liability for the claims, not for their full amount, and the liability is that set up in the reserve. The purpose of the footnote was to show a breakdown in regard to that part of the liability reserve attributable to unpaid matured endowments.

Melvin Gold, a consulting actuary and a Fellow in the Society of Actuaries, and Abraham Haselcorn, also a Fellow in the Society of Actuaries and an actuary for Lybrand, Ross and Montgomery, testified on behalf of Baltimore Life. They both testified that Baltimore Life had validly employed a classical actuarial approach in the establishment of the reserve for non-premium paying matured endowments by analyzing past experience, setting up the equivalent of a mortality or a continuance table and using the table to estimate future liability. They described the technique as being a "classical or almost pure and simple" method, "a pretty standard approach * * * that is continuously used," and actuarially sound, even though the approach in its current application by Baltimore Life had not been written up. It is interesting to observe, however, that 30 of the 45 companies which answered the first part of Question 4 on the questionnaire submitted to them by Baltimore Life indicated that they considered the continuance table method of establishing the reserve as employed by Baltimore Life to be a sound one.

I am not impressed by the fact that no other companies use the continuance table method used by Baltimore Life. The question is not whether the method is novel or unique, but whether it is sound. The facts indicate that the method is sound. It adequately provides for the payment of all claims for non-premium paying endowments which will be presented to the Company. It is fair to the policyholders of this well-operated mutual company. The Company is eminently solvent and there is no danger that its accounting practice will render it insolvent. A proper con-

struction of the applicable statutory provisions indicates to me that its accounting practice is not prohibited and the Commissioner's order was illegal. I would affirm the order of the lower court.