## MARYLAND FIRE UNDERWRITERS RATING BUREAU ET AL. *v.* INSURANCE COMMISSIONER OF MARYLAND

[No. 197, September Term, 1970.]

*Decided January 5, 1971.*

The cause was argued before HAMMOND, C. J., and McWILLIAMS, FINAN, SINGLEY and DIGGES, JJ.

*Alan N. Gamse* and *Norman P. Ramsey* for appellants.

*Richard G. McCauley, Assistant Attorney General,* with whom was *Francis B. Burch, Attorney General,* on the brief, for appellee.

SINGLEY, J., delivered the opinion of the Court.

This is an appeal from judgments entered in the Baltimore City Court in favor of Maryland's Insurance Commissioner in three proceedings which challenged the va-

lidity of orders entered by the Commissioner denying requests for authority to increase certain insurance rates.

Late in 1968, and early in 1969, three insurance rating bureaus, Maryland Fire Underwriters Rating Bureau, Multi-Line Insurance Rating Bureau and Transportation Insurance Rating Bureau (the Rating Bureaus) had made virtually identical but not simultaneous filings with the Commissioner in support of a proposed increase of 10.5% in premiums to be charged on homeowners insurance policies, assuming no change in deductible options. The filings were made under our Insurance Code, Code (1957, 1968 Repl. Vol.) Art. 48A (the Act). The purpose of the Act's Subtitle 16, which deals with rates, is stated in § 241:

> "The purpose of this subtitle is to promote the public welfare by regulating insurance rates to the end that they shall not be excessive, inadequate or unfairly discriminatory, and to authorize and regulate cooperative action among insurers in rate making and in other matters within the scope of this subtitle. * * *"

The Act, after providing again in § 242 (b) (1) (ii) that "Rates shall not be excessive, inadequate or unfairly discriminatory" continues in § 242 (b) (1) (iii):

> "Due consideration shall be given to past and prospective loss experience within and outside this State, to the conflagration and catastrophe hazards, to a reasonable margin for underwriting profits and contingencies, or dividends, savings or unabsorbed premium deposits allowed or returned by insurer to their policyholders, members or subscribers, to past and prospective expenses both country-wide and those specially applicable to the State, and to all other relevant factors within and outside this State; and in the case of fire insurance rates consideration shall be given to the experience of the fire insurance business during a period of not less than the

most recent five-year period for which such ex-
perience is available."

It was this section of the Act upon which the Rating Bu-
reaus chose to rely.

In essence, what the filings did was to make use of an
accepted actuarial technique. Tables had been prepared
which showed the actual experience of companies which
wrote homeowners insurance in Maryland during the
years 1961-1966, both inclusive. Earned premiums were
then adjusted retrospectively to reflect changes in rates
which had taken place, whether increases or decreases, in
1961, 1963 and 1965. No account was taken, however, of
a "civil disorder loading" authorized by the Commissioner
in 1968.[1] Losses actually experienced were then adjusted
for each year to reflect a trended cost factor. Finally, a
catastrophic windstorm loss factor was developed by ex-
trapolation, since there was no experience available for
homeowners policies, and resort was had to the losses sus-
tained by companies writing policies of fire and extended
coverage insurance. The result produced an average loss
ratio, i.e., adjusted losses as a percentage of adjusted
earned premiums, of 65.6% for the six year period. The
filings asserted that 60% was the "balance point," i.e.,
that losses in excess of that percentage made underwrit-
ing unprofitable.

In accordance with the provisions of § 242 (c) (4) of
the Act the filings would have been deemed to meet the
requirements of the Act after 15 days unless disapproved
by the Commissioner, or unless the time were extended.[2]

---

1. The civil disorder loading was a flat annual increment of $1.00
in the premium charged on each homeowners policy, put into ef-
fect in July of 1968, after the disturbances of April of that year,
at a time when the consequences were largely undetermined.

2. In the vocabulary of the insurance industry this seems to be
known as a "deemer" provision. The Commissioner contends that
the filings should have been made under the comparable provisions
of § 243 of the Act, which deals with casualty and surety ratings,
because homeowners policies have casualty components. Insofar as
this case is concerned the difference between the two sections is
minimal, except that § 242 requires that consideration be given
five years' experience and § 243 fixes no period.

There were several extensions of the 15 day period during which the Rating Bureaus supplied additional information in response to the Commissioner's requests. Finally, after the last extension had expired, the Rating Bureaus notified the Commissioner that the increased rates would be put into effect on 1 June 1969.

On 3 June, the Commissioner issued an order scheduling a hearing on a date subsequent to 16 June, to determine whether the new rates were "excessive, inadequate or unfairly discriminatory," which § 242 (d) (3) permits after a filing has become effective. At the hearing on 25 June, the only testimony of consequence was that of Eugene Graham, who held the position of Actuary Three in the State Insurance Department. Mr. Graham testified in support of a table which he had prepared, covering the five year period 1962-1966, both inclusive, using the figures submitted by the Rating Bureaus respecting premiums actually earned and losses actually incurred. After adjusting losses by the use of a factor of 12.5% to reflect rising construction costs, Graham developed an average loss ratio of 55.9% for the five year period.

Mr. Graham reached the conclusion that even if the Rating Bureau's "filing in itself was not deficient, and the sixty percent loss ratio balance was correct, then it is the contention of the Property Division of the Insurance Department that the rates that went into effect on June 1st, 1969, are excessive."

The Rating Bureaus offered no testimony in support of their filings, relying at the time on the contentions that the Commissioner had not met the burden of proof and the order scheduling the hearing was procedurally defective. The latter contention was seemingly abandoned. At the conclusion of the hearing, the Commissioner issued his finding and order.[3]

"Pursuant to the power vested in me under
Article 48A of the Annotated Code of Maryland

---

3. Identical orders were entered respecting the filings of the other Rating Bureaus. The three cases were consolidated on appeal.

(1968 Replacement Volume), I, Newton I. Steers, Jr., as Insurance Commissioner for the State of Maryland do hereby find that the filing made by the Maryland Fire Underwriters Rating Bureau on December 27, 1968 as amended by replies to requests by the Insurance Department for additional information, fails to meet the requirements of Article 48A in that:

1. The filing did not reflect the Civil Disorder Loading approved by this Department on July 25, 1968.

2. The filing included an allowance for catastrophic losses which was not justified.

3. The filing simply asserted an expense allowance of 40% and gave no breakdown or any support whatever to show that such expense allowance was proper.

4. The filing did not reflect any part of investment income in the figures for premiums earned or to be earned.

5. The filing disclosed unadjusted loss ratios for the five years ending December 31, 1966 which do not justify the rate increase requested.

"Accordingly, it is hereby ordered that any homeowners rate increases which were put into effect pursuant to the above filings shall not be effective after July 26, 1969. The homeowners rates which had been in effect prior to the effective date of the filing shall be used after July 26, 1969 pursuant to law."

The Rating Bureaus entered timely appeals to the Baltimore City Court as permitted by § 245 (2) of the Act. At the hearing, argument was largely focused on the Rating Bureaus' omission of the civil disorder loading and the inclusion of the catastrophic windstorm factor. From an order of that court affirming the Commissioner's order, this appeal was taken.

At the outset, it would be well to delineate the narrow

scope of judicial review of legislative functions of the Commissioner arising under the rating subtitle of the Act.[4] The Act itself provides in § 245 (2):

> "All orders or decisions of the Commissioner shall be subject to review by appeal to the Baltimore City Court. * * *"
>
> * * *
>
> "If the Baltimore City Court finds that the Commissioner's order or decision is not supported by the preponderance of the evidence on consideration of the record as a whole, or is not in accordance with law, the court shall reverse or modify the Commissioner's order or decision in whole or in part."

and then provides for the taking of an appeal to this Court as in other civil cases.

Judge Sodaro, who heard the case below, recognized the limits imposed by the Act:

> "Being mindful of the statutory requirement that rates shall neither be excessive nor inadequate and unfairly discriminatory, and applying the principles of the appropriate decisions, the Court is unable to hold that a reasoning mind could not, using the preponderance of the evidence test, arrive at the conclusions asserted by the Commissioner. Nor can the Court upon consideration of all the testimony, including numerous exhibits, rule that the Commissioner's action was arbitrary and unreasonable. It appears that both his findings and conclusions were based on and supported by sufficient facts and proper factual inferences. It seems that he

---

4. Appeals from the exercise of a quasi-judicial function by the Commissioner are governed by § 40 of the Act, which provides for a hearing de novo. Compare *Nuger v. State Ins. Comm'r*, 238 Md. 55, 207 A.2d 619 (1965) with *State Ins. Comm'r v. Baltimore Life Ins. Co.*, 248 Md. 120, 235 A.2d 537 (1967).

has followed legislative directive in reaching his factual conclusions on the basis of a preponderance of the evidence. Whether the Court would have valued the evidence differently and reached a different result is not determinative of the issues presented. It cannot make its own independent decision."

In reaching this conclusion, Judge Sodaro relied upon the opinion of this Court in *State Ins. Comm'r v. National Bureau of Cas. Underwriters*, 248 Md. 292, 236 A. 2d 282 (1967). In the course of that opinion, which carefully considered the scope of judicial review permitted by § 245 of the Act, this Court, speaking through Chief Judge Hammond, said:

"* * * We read the direction to the court to determine whether or not the Commissioner's order is supported by a preponderance of the evidence to mean that the court must rule whether or not the Commissioner followed the legislative directive to reach a factual conclusion in the matter before him on the basis of a preponderance of the evidence, not to make its own independent decision whether it would have valued the evidence in the same way and reached the same result. The statutory standard imposed on the court is not to decide whether the Commissioner was right in his factual determinations and inferences but whether those determinations could reasonably have been made by a reasoning mind using the preponderance of the evidence test. The reviewing court must decide only whether the Commissioner could reasonably have decided that a preponderance of the whole evidence supported his conclusions of fact, not whether those conclusions were correct. The permission given the court to modify the administrative order or decision refers, we think, to correction of orders or decisions 'not in accordance

with law' and was not intended to permit a modification on the facts." 248 Md. at 305

and concluded:

"We hold that a court in reviewing legislative actions or decisions of an administrative agency may apply the weight of the evidence test to the factual findings of the agency, without exercising nonjudicial functions, provided it does not itself make independent findings of fact or substitute its judgment for that of the agency. Section 245 of Art. 48A, properly construed, does no more than permissibly require the court to decide (1) the legality of the Insurance Commissioner's actions, and (2) whether a reasoning mind reasonably could have determined that the factual conclusion reached was proven by the weight of the evidence on the record as a whole." 248 Md. at 310.

It is difficult to imagine a more persuasive example of the reason why a court should be loath to substitute its judgment for the result reached by an administrative agency than that presented by this case. Rate making is a highly complex procedure accomplished by experts trained in the field. As we see it, all the Commissioner was saying was that an increase in rates postulated on changes in circumstances and conditions must take all of the changes into account and that while § 242 (b) (1) (iii) provides that consideration be given catastrophic losses, the factor must be properly developed. That the Rating Bureau's filings did not take the civil disorder loading into account is shown by the filings themselves. The existence of such a loading could be established from the Commissioner's prior orders, of which he was entitled to take notice. While this precise question seems to have been determined only peripherally in Maryland, it is established elsewhere that an insurance Commissioner may take notice of the records of his department, which need

not be introduced in evidence, *State Farm Mut. Auto. Ins. Co. v. Williams*, 192 So. 2d 312 (Dist. Ct. App. Fla. 1966) ; *Mutual Ins. Rating Bureau v. Williams*, 189 So. 2d 389 (Dist. Ct. App. Fla. 1966) ; *Employers Mut. Liab. Ins. Co. v. Premo*, 152 Conn. 610, 211 A. 2d 154 (1965). Compare, *Dal Maso v. Board of County Comm'rs of Prince George's County*, 238 Md. 333, 209 A. 2d 62 (1965), where we permitted the County Commissioners, in reaching a decision, to consider the report of its technical staff, which had been referred to at the hearing, but not introduced in evidence. In *Dal Maso* we said, speaking through Judge Oppenheimer :

> "In general, administrative agencies are not bound by the technical common law rules of evidence, but they must observe the basic rules of fairness as to parties appearing before them * * *. But it is the substance, not the form, which governs. When the party appearing before the board has the opportunity, however informally granted, to examine and challenge the report in question before the board reaches its conclusion, the requisite of procedural fairness has been met. See *Duncan v. McNitt Coal Co.*, 212 Md. 386, 396, 129 A. 2d 523 (1957) and Cohen [Some Aspects of Maryland Administrative Law, 24 Md. L. Rev. 1 (1964)] at 16-18." 238 Md. at 337.

In his opening statement at the hearing, the Commissioner stated that he regarded the filings deficient because they failed to reflect the civil disorder loading. The *Dal Maso* test of requisite procedural fairness was met.

The filings also showed that there had been no experience respecting catastrophic windstorm losses under homeowners policies in Maryland.[5] The development of a factor from fire and extended coverage experience failed

---

5. A catastrophic loss is one in which losses of $1,000,000 or more are sustained by all companies as a consequence of a single natural occurrence within a particular state.

to take into consideration, as the appellee points out, that such coverage is not limited to dwellings.

The Rating Bureaus would have us substantially discount Mr. Graham's testimony for the reason that although his job classification was that of actuary, he admitted that he was not a qualified actuary, and, therefore, could not testify as an expert. The short answer to this is that the crux of Graham's testimony was a loss ratio figure which he developed from the Rating Bureaus' unadjusted figures by a simple exercise in mathematics. There seems to be no contention that the calculations he made were not one of the appropriate yardsticks to be considered in the determination of rates.

We conclude that an application to this case of the standards identified in *State Ins. Comm'r v. National Bureau of Cas. Underwriters, supra,* 248 Md. at 310, can lead to but one result. A reasoning mind reasonably could have determined that the Rating Bureaus' omission of the civil disorder loading and inclusion of an inappropriately developed catastophe factor was proven by the weight of the evidence on the record taken as a whole. It follows that when the Commissioner determined that a filing which contained such an omission and such an inclusion did not meet the requirements of Article 48A, his determination was in accordance with law.

> *Judgments affirmed, costs to be equally divided among appellants and paid by them.*